NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11342

COMMONWEALTH  vs.  TIMOTHY CASSIDY.


Bristol.     September 5, 2014. - December 16, 2014.

Present: Gants, C.J., Spina, Botsford, Lenk, & Hines, JJ.


Homicide.  Evidence, Third-party culprit, Relevancy and
     materiality, Cumulative evidence, Hearsay, Opinion,
     Consciousness of guilt, Intoxication, Bias of government
     witness, Unavailable witness.  Fair Trial.  Constitutional
     Law, Fair trial.  Due Process of Law, Fair trial.  Jury and
     Jurors.  Witness, Unavailability.  Practice, Criminal,
     Capital case, Assistance of counsel, Argument by counsel,
     Argument by prosecutor, Fair trial, Jury and jurors,
     Question by jury.



     Indictment found and returned in the Superior Court
Department on February 8, 2008.

     The case was tried before Barbara A. Dortch-Okara, J.


     Robert F. Shaw, Jr., for the defendant.
     Thomas M. Quinn, III, Assistant District Attorney (Yul-mi
Cho, Assistant District Attorney, with him) for the
Commonwealth.


     HINES, J.  In January, 2012, a jury convicted the

defendant, Timothy Cassidy, of murder in the first degree on the

theory of extreme atrocity or cruelty.[1]  Represented by new counsel on appeal, the defendant argues that (1) the trial judge committed numerous evidentiary errors that undermined the defendant's right to present his defenses and deprived him of due process and fundamental fairness under the United States Constitution and the Massachusetts Declaration of Rights; (2) defense counsel misstated evidence during his closing argument; and (3) the judge improperly responded to a question posed by the jury.  We affirm the defendant's convictions and discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

Background.  1.  The Commonwealth's case.  We recite the facts the jury could have found based on the Commonwealth's case, see Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979), reserving certain details for our discussion of the specific issues raised.  The defendant and the victim, James Madonna, were best friends.[2]  On Tuesday, November 20, 2007, between 7 and 7:30 P.M., the defendant went to the victim's house.  The two had plans to play poker at a hotel located in an industrial park in Taunton.  Instead of driving together, they

---

[1] The Commonwealth also had proceeded under a theory of deliberate premeditation, but the jury did not find the defendant guilty under that theory.

[2] The victim worked for a construction company that the defendant had owned for a short time.  The defendant sold the business and the victim continued to work as a finish carpenter for the new owner.

drove separately.  A fellow poker player saw them leaving the hotel together at approximately 8:15 P.M.

Telephone records confirmed that at 10:11 and 10:12 P.M., the defendant's wife telephoned him, asking him to bring home some medicine.  He went to a nearby pharmacy at 10:21 P.M. and purchased the medication along with a package of cigarettes.  He arrived home between 10:30 and 11 P.M.  He did not enter the house immediately, but went to the garage where he remained for about twenty minutes.

The victim did not return home that evening.  His wife, who was related to the defendant,[3] repeatedly called the victim's cellular telephone, to no avail.  She took their eldest son, James, out looking for the victim.  James telephoned the defendant, who stated that the victim, after playing poker, said that he was going to meet a friend.

The next morning, the victim's wife telephoned the defendant, who told her that he had left the poker game early, but that the victim had stayed to continue playing.  The defendant went to the victim's home and joined James in looking for the victim.  The search was unsuccessful, and after filing a

---

[3] The victim's oldest son testified that his mother and the defendant were cousins.  The victim's wife testified, however, that the defendant was a son of her cousin.  The exact relation is of no significance.

missing person's report at the Taunton police department, the two returned to the victim's house.

Shortly thereafter, the defendant suggested that they resume their search and look through "every single parking lot" in the industrial area near the hotel. After some searching, the defendant suggested that James drive to a parking lot in the area near a particular convenience store. James had to change direction to do so. As he drove into the parking lot in the back of the building, James recognized his father's automobile, which was running.

Thinking that his father was drunk and sleeping, James went over to the victim's automobile. There he discovered the victim who, though seated in the driver's seat, was "slumped over" onto a cooler in the passenger seat side of the automobile. A significant amount of blood was on the inside window to the front passenger door, and on the cooler. The victim was unresponsive and his son telephoned 911. As he was doing so, the defendant went to the opposite side of the automobile and looked inside.

The victim had been shot once in the neck and four times in the back, left side of his head. The medical examiner testified that the victim's skull had been shattered, his brain "extremely fragmented," and that there was "a large amount of destruction." She could not determine the sequence of the gunshot wounds and

opined that the victim could have remained conscious for minutes after suffering the gunshot wound to the neck. The gunshot wounds to the back of the victim's head, however, would have resulted in death within seconds. The victim died as result of gunshot wounds to his head and neck, with perforations to his skull and brain.

Police arrived at the parking lot shortly thereafter. The defendant was shaken and indicated that he suffered from heart problems. A police officer directed a firefighter to treat him, and the defendant was taken to a different area of the parking lot where an ambulance was parked.

By the driver's side of the victim's automobile, police recovered cigarette ash on the door and one cigarette butt on the ground. A second cigarette butt was found on the opposite side of the parking lot, in the vicinity of where the ambulance had been parked. The cigarette butts were sent for deoxyribonucleic acid (DNA) testing, which revealed that the DNA recovered from them matched the defendant's DNA.[4]

Police also recovered five .40 caliber discharged shell casings manufactured by Federal, one from outside the victim's automobile and four from the inside. In addition, police found

---

[4] The statistical significance of the deoxyribonucleic acid (DNA) testing was presented to the jury. See Commonwealth v. Ortiz, 463 Mass. 402, 408 & n.10 (2012); Commonwealth v. Lanigan, 419 Mass. 15, 20 (1994).

two spent projectiles and one spent metal jacket[5] inside the automobile.  Three .40 caliber spent projectiles were recovered from the victim by the medical examiner.  The Commonwealth's firearms identification expert opined that, based on his examination, all of the discharged cartridge casings recovered during the investigation and all of the spent projectiles and the spent metal jacket were fired from the same weapon.

There was evidence that the defendant was licensed to possess and owned a .40 caliber Star Modern Firestar semiautomatic pistol.  He usually kept it in the top drawer of his bureau, but it was missing when his wife looked a day or two following the victim's murder.  When police, pursuant to a warrant, searched the defendant's house on Friday, November 23, they found a fifty-round box of Smith and Wesson Federal .40 caliber ammunition; five rounds were missing from the box.  They did not find the defendant's .40 caliber pistol.  Police eventually recovered the defendant's pistol and submitted it for forensic testing.[6]  The Commonwealth's firearms identification

_____

[5] The Commonwealth's firearms identification expert explained that a projectile can be "jacketed," meaning that there is a copper jacket encasing the lead core of the bullet. When the weapon is fired, sometimes the copper jacket and lead core stay intact, while other times the lead core separates from the jacket.

[6] The pistol was recovered almost two years later in November, 2009.  Although the defendant was in jail awaiting trial at this time, there was evidence that, while he was

expert opined that, based on his examination, all of the recovered .40 caliber discharged cartridge casings had been fired from the defendant's pistol. He was unable, however, to determine whether the recovered projectiles had been fired from the defendant's pistol.

The Commonwealth's evidence showed that, at the time of the victim's murder, the defendant was experiencing significant financial trouble. In connection with a franchise business the defendant had undertaken, he could not account for approximately $14,657 and had been given until November 21 either to pay back the money or to produce proof that deposits had been made. He did neither, and continued to make excuses.

The defendant, without his wife's knowledge, borrowed money from the victim and his wife. In late October, 2007, the victim and his wife pressed the defendant to repay $30,000 on a loan of $25,000 that they had made to the defendant. The victim's wife

awaiting trial, he had sent a letter to his stepfather directing him to pick up a can of contact cement from the defendant's house. The pistol was inside the can (which had been manufactured only recently). In further correspondence, the defendant arranged for the can containing the pistol to exchange hands and eventually be planted under a shed at a particular address or under the driver's seat of a Lincoln automobile that would be there. There was evidence that Kevin Hayes, the brother of the victim's wife, drove a Lincoln automobile. The plan was thwarted, and the pistol recovered, after one of the people involved, Gerard Menard (a former inmate who had been housed with the defendant, contacted police. No forensic evidence was obtained from the pistol, which had been submerged in paint inside the can and was not loaded.

threatened the defendant that she would inform his wife about the loan if he did not pay them back by Monday, November 19 (the day before the victim's murder).

The defendant, through the help of Kevin Hayes, who was the brother of the victim's wife, had borrowed $40,000 from a "loan shark in Brockton" (loan shark) in September or October, 2007. In exchange for this loan, the defendant agreed to pay $10,000 in interest, and signed over a motorcycle and granted as collateral a mortgage on a parcel of land in Maine that he owned with his wife.[7] The defendant, without telling his wife, also had borrowed large sums of money from her uncle. The defendant further kept his wife uninformed about running up charges on their credit card, withdrawing money from an equity line of credit, and cashing a tax refund check made payable to them jointly without obtaining her signature. At one point, in September or October of 2007, the defendant's wife asked him to move out of their home due to his financial dealings.

The defendant spoke with police following the murder. On November 21, 2007, he spoke twice with State Trooper Michael Cherven and Taunton police Officer Honorato M. Santos. In the first interview, which started about 3:15 P.M. and was recorded, the defendant told them that he did not know why anyone would

_____

[7] The mortgage later was invalidated because the signature of the defendant's wife had been forged. She was not informed of her husband's business with the loan shark.

want the victim dead.  The defendant said he had left the hotel at 9:30 P.M.  He told police that after leaving the hotel, he went to a specific store and purchased a package of cigarettes.[8] The defendant informed the officers that he went to a pharmacy thereafter to purchase some medication for his wife.  The defendant acknowledged to the officers that he owned a number of firearms and indicated specifically what he owned, but made no mention of his .40 caliber pistol.

The following day, November 22, near midnight, the defendant returned to the police station, claiming that earlier Hayes had taken a shotgun from his truck and "racked" it toward his direction.  Trooper Cherven offered the defendant police protection, but he declined.  Trooper Cherven asked the defendant if he thought Hayes had killed the victim.  The defendant replied that he did not.

The defendant agreed to speak with police again and the interview was recorded.  Because the police had obtained additional information about the defendant's whereabouts after leaving the hotel with the victim, Trooper Cherven informed the defendant that they could not see the defendant on the surveillance videotape from the store at which he had claimed to purchase cigarettes.  The defendant insisted that he had been

---

[8] Police soon thereafter learned that the store did not carry the brand of cigarettes that the defendant smoked, and the store's surveillance footage did not confirm his presence there.

there. When asked about receiving a loan from the victim, the defendant admitted to having borrowed money from the victim, but stated that the loan amount was $10,000. When Trooper Cherven confronted him with checks concerning the $25,000 loan, the defendant expressed shock and insisted the he had only borrowed $10,000 from the victim. The defendant told police that the victim owed him money. The defendant left around 2:30 A.M. on November 23. He agreed to return later for further questioning.

The defendant did not return. Instead, he stole a blank check from his wife's uncle, wrote himself a check for $4,000, cashed it, and fled. He was arrested in Georgia in December after vanishing from his family with no word of his whereabouts. When he was arrested, he had altered his appearance and was using a fictitious name and address. When apprehended, the defendant said, "Fuck. Okay. You got me -- you got me."

After his arrest, the defendant was detained pending trial. While he was awaiting trial, the defendant on several occasions attempted to fabricate evidence relative to the murder, including an attempt to plant the murder weapon on Hayes. See note 6, supra.

2. The defendant's case. The defendant testified. According to him, the victim had been delivering cocaine for a motorcycle gang called the "Outlaws." About one and one-half years before the victim was killed, the victim had a package

delivered to one of the defendant's stores. The defendant opened the package and discovered five packages of cocaine. He told the victim he wanted nothing to do with it and left it behind one of his stores. The defendant stated that the package went missing and gang members contacted him and the victim to let them know that they were going to be held responsible for the loss of the drugs and would have to reimburse the gang $150,000. The gang members threatened to kill their families if they did not pay.

To repay the gang, the defendant testified that he took money from his stores and obtained, with the help of Hayes, a loan from the loan shark for $35,000. The money from the loan was to be used for a drug transaction that was to involve the defendant, the victim, and Hayes. According to the defendant, Hayes set up the deal. It occurred after the poker game on November 20, 2007, in the parking lot where the victim was found. The defendant testified that he watched from the "far corner" of the parking lot. He testified to the following. The defendant saw Hayes leave his automobile and go over to the victim, who was standing outside of his automobile. Hayes reached into the victim's automobile and grabbed something out of the front seat, then walked away. The victim entered his automobile. After a couple of minutes, a truck pulled into the parking lot. Hayes went over to the driver's side of the truck

and exchanged "bags" with the driver.  Hayes returned to his automobile and tossed the bag inside.  Hayes then returned to the victim.  The two appeared to be talking, and then Hayes shot the victim five times.  Hayes went over to the defendant, pointed the gun at him, told him to leave, and threatened him and his family if he "opened his mouth."

The defendant testified that he did not tell anyone that Hayes had killed the victim because he was "scared" based on Hayes's threat to him.  The defendant said that on November 22, from a distance, Hayes had "racked" a shotgun at him and stated he had more guns in his possession; on the morning of the next day, he received a telephone call from Hayes; after this call, the defendant decided to leave town because he was in fear of his life and the lives of the members of his family.  The defendant admitted that, before he left, he stole $4,000 from his wife's uncle and altered his appearance.  He left a note to police inside his automobile that he abandoned during his flight encouraging police to "keep looking for" the victim's killer.

The defendant also testified that the victim had full access to his home at any time.  The defendant last saw his .40 caliber pistol with the victim, who had received his permission to borrow it.

The defendant admitted that he had "lied from the beginning."  He had done so and had created various schemes from

jail to plant and fabricate evidence because he was afraid and because he wanted to expose Hayes as the killer.

Through the cross-examination of the Commonwealth's witnesses, the defendant elicited that there was a lack of physical evidence establishing that he had been the shooter and that the police investigation had been inadequate, thus laying the basis for a Bowden defense, see Commonwealth v. Bowden, 379 Mass. 472, 486 (1980). In addition, defense counsel argued, relying on his cross-examination of Trooper Cherven, that the police had not fully investigated existing third-party culprit evidence that pointed to Hayes as being the shooter.

Discussion. The defendant argues that (1) the trial judge committed numerous evidentiary errors that undermined his right to present several defenses and deprived him of due process and a fair trial; (2) defense counsel misstated evidence during his closing argument; and (3) the judge improperly responded to a jury question.

1. Evidentiary errors. The defendant claims that the judge "repeatedly and improperly prohibited" him from introducing evidence relating to the adequacy of the police investigation pursuant to Commonwealth v. Bowden, supra. He contends also that he was precluded from presenting third-party culprit evidence and from rebutting and responding to the Commonwealth's consciousness of guilt evidence. The defendant

argues that these erroneous rulings caused "a common threat of severe prejudice," depriving him of the right to present his defense, the right to confrontation, and the right to a fundamentally fair proceeding.[9]

a. *Adequacy of the police investigation.* A defense of inadequate police investigation suggests to a jury "that the evidence at trial may be inadequate or unreliable because the police failed to conduct the scientific tests or to pursue leads that a reasonable police investigation would have conducted or investigated," with the result that the police may have missed "significant evidence of the defendant's guilt or innocence." Commonwealth v. Silva-Santiago, 453 Mass. 782, 801 (2009). "Under the so-called Bowden defense, a defendant [also may] challenge the adequacy of a police investigation [by using] information concerning third-party culprits to question whether the police took reasonable steps to investigate the crime." Commonwealth v. Ridge, 455 Mass. 307, 316 (2009), citing Commonwealth v. Bowden, 379 Mass. at 486. "Because any

_____

[9] The defendant raises more than thirty such evidentiary errors and does so in footnotes. In these footnotes, he provides no individual legal analysis or citation to the relevant legal authority on which he relies. "Briefs that limit themselves to 'bald assertions of error' that 'lack[] legal argument . . . [do not] rise[] to the level of appellate argument' required by [Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975)]." Kellogg v. Board of Registration in Med., 461 Mass. 1001, 1003 (2011). Nevertheless, we reviewed these claims pursuant to our duty under G. L. c. 278, § 33E, and conclude that they do not present any basis for relief.

statements introduced as part of such a defense are offered not for their truth, but to prove that the police did not take 'reasonable steps to investigate,' those statements are not hearsay."  Commonwealth v. Bizanowicz, 459 Mass. 400, 414 (2011), quoting Commonwealth v. Ridge, supra.  "Evidence is admissible to show inadequate police investigation, however, only if police learned of it during the course of their investigation."[10]  Commonwealth v. Bizanowicz, supra, citing Commonwealth v. Silva-Santiago, supra at 803.  In addition, the judge must determine "whether the probative weight of the Bowden evidence exceed[s] the risk of unfair prejudice to the Commonwealth from diverting the jury's attention to collateral matters."  Commonwealth v. Silva-Santiago, supra.  "If the [evidence] is admitted, the Commonwealth may offer evidence explaining why the police did not follow that line of investigation."  Commonwealth v. Ridge, supra, citing Commonwealth v. Silva-Santiago, supra at 803 n.25.

"[T]he exclusion of evidence of a Bowden defense is not constitutional in nature and therefore is examined under an abuse of discretion standard."  Commonwealth v. Silva-Santiago, supra at 804 n.26, citing Commonwealth v. Mayfield, 398 Mass.

_____

[10] In deciding whether to admit such evidence, a trial judge must "conduct a voir dire hearing to determine whether the third-party culprit information had been furnished to the police."  Commonwealth v. Silva-Santiago, 453 Mass. 782, 803 (2009).

615, 629 (1986).  See Commonwealth v. Wood, 469 Mass. 266, 278 (2014).  Where there has been an abuse of discretion, we review properly preserved challenges involving alleged Bowden violations for prejudicial error.  Commonwealth v. Ridge, 455 Mass. at 317-318.  With regard to unpreserved challenges, and where there has been an abuse of discretion, we review to determine whether a substantial likelihood of a miscarriage of justice occurred.  See Commonwealth v. Matthews, 450 Mass. 858, 866, 872 (2008).  See also G. L. c. 278, § 33E.

i.  Exclusion of evidence that police were informed that victim's murder involved drugs.  The defendant objects to four instances where the judge excluded evidence that the police received information that the victim's murder likely involved drugs.  First, although we agree with the defendant that the judge should have permitted defense counsel to ask the victim's wife whether she told the police after her husband's murder that she believed that her husband's death was "over drugs," the error did not prejudice the defendant.  See Commonwealth v. Ridge, 455 Mass. at 317-318.  The defendant successfully elicited from Trooper Cherven that "numerous people," including the victim's wife and son, had suggested to police that the murder might have been connected to drugs.  The jury heard this information and the victim's wife's testimony would have been cumulative.  See Commonwealth v. Alammani, 439 Mass. 605, 611-

612 (2003) (exclusion of statements involving facts of which jury were already aware would have been cumulative and any erroneous exclusion of such statements would not have prejudiced defendant).

The defendant's Bowden defense also was not impaired when the judge refused to permit defense counsel to elicit from Sergeant Santos whether the purported "illegitimate purpose" of a check from the victim to the defendant was to hide drug activity. The judge did not abuse her discretion in concluding that there was no basis to question Santos, who had been present only as a witness during the questioning of the defendant, about this subject, and that the subject should be left for Trooper Cherven, the lead investigator who had conducted the questioning. See Commonwealth v. Andrews, 403 Mass. 441, 461 (1988) (judge properly excluded witness's testimony where witness had no personal knowledge of purported event). Defense counsel later did ask Trooper Cherven whether he investigated the purpose underlying the loan and whether the loan money was "not for [a] legitimate reason."

The defendant asserts that his Bowden defense also was impaired when the judge did not allow him to call a witness who was expected to testify that, every ten minutes during the poker game, he saw the victim walking outside. The witness, however, did not see anything that occurred when the victim went outside.

Thus, the judge properly refused defense counsel from asking the jury to infer from the expected testimony that the reason the victim went outside was to meet someone for a drug deal. There was no error. See Commonwealth v. Bright, 463 Mass. 421, 441 (2012); Olson v. Ela, 8 Mass. App. Ct. 165, 167 (1979).

The defendant contends that the judge erroneously precluded him from calling one of the victim's brothers, Joe, as a witness to testify that he had given information to police concerning the victim's drug activities. Joe spoke with police on November 22, 2007. The interview was recorded and marked for identification at trial. In that interview, Joe told police that he thought that the victim's death had something to do with drugs, the victim may have been dealing drugs, and the "guys" from the Budweiser plant may have been involved.[11] Joe also stated that initially he thought that his brother's death may have resulted from a drug overdose. At trial, defense counsel objected to the exclusion of Joe's testimony on the basis that it should have led the police to investigate Hayes.[12] Defense

_____

[11] There was evidence that the victim had previously worked at the Budweiser plant, which was close in proximity to where his body was found.

[12] Defense counsel argued to the judge that in the interview, Joe had told police that Hayes was upset at the victim for cheating on his sister (the victim's wife), and that "perhaps the last breath of Kevin Hayes' father was [']kill [the victim,'] and Joe thought it was curious that [the victim] was killed after Kevin Hayes' father had passed away two days

counsel did not object on grounds relating to an inadequate investigation of the victim's alleged drug activities. No substantial likelihood of a miscarriage of justice could have arisen from the exclusion of this evidence because the information had already come out at trial through other witnesses and would have been cumulative. See Commonwealth v. Alammani, 439 Mass. at 611-612. Further, Joe's statements in his police interview were clearly his personal suspicions based on questionable conduct by the victim (possession of a camcorder bag and telephone calls followed by trips to a fast food restaurant) that he had observed. Joe, however, never actually saw any drugs.[13]

ii. Exclusion of evidence that police were informed of suspicions that Hayes may have been involved in victim's murder.

---

earlier." The defendant's references are taken out of context. In the recording, Joe acknowledged that Hayes had been aware that the victim had cheated on the victim's wife and had been angry, but Joe did not think Hayes had killed the victim. Also, when discussing how people can hold grudges, Joe said that "someone said" that "maybe" Hayes's father's last words had been "kill [the victim]." The information concerning Hayes being upset with the victim for having cheated on the victim's wife had already come out through Trooper Cherven, so its exclusion would not have been prejudicial to the defendant. The latter information about what the victim's father may have said was inadmissible hearsay and improper speculation.

[13] The same points apply with regard to the defendant's remaining arguments concerning the victim's involvement with drugs. Instances of limitation of such evidence fell within the sound discretion of the trial judge, keeping in mind that the issue was a collateral one and, as it pertained to drug use by the victim, tended to prejudice the victim unduly.

No prejudice to the defendant could have arisen from the exclusion of testimony from the defendant's stepfather regarding suspicion, conveyed to the police, that Hayes was involved in the victim's death because the evidence came in through Trooper Cherven.  See Commonwealth v. Alammani, 439 Mass. at 611-612.

iii.  Exclusion of evidence concerning information about "Scotty."  Contrary to the defendant's suggestion, the judge did not abuse her discretion in precluding the defendant from asking Trooper Cherven whether Kelly Croce had told police that somebody named Scotty had warned her that something might happen.[14]  There was no proffer that Scotty's statement had anything to do with the victim's death, and the judge, based on the record before her, correctly determined that the proffered evidence likely would generate jury confusion.  See Commonwealth v. Bright, 463 Mass. at 441.  For these same reasons, the judge did not abuse her discretion in handling other attempts by defense counsel to admit evidence regarding Scotty.  See id.

iv.  Exclusion of evidence concerning Croce's boy friend. Because Trooper Cherven did not interview Croce's boy friend, the judge did not abuse her discretion in precluding the defendant from questioning Trooper Cherven about police

---

[14] There was evidence that Hayes and the victim had been involved with drugs with Kelly Croce and her boy friend.  There was also evidence that Croce told police that Hayes was upset with the victim because the victim had stolen his drug contacts.

questions posed to Croce's boy friend.  See Commonwealth v. Andrews, 403 Mass. at 461; Commonwealth v. Whitehead, 379 Mass. 640, 656 (1980).  The defendant called the officer who did, Trooper Christopher Dumont.

v.  Exclusion of evidence of how police considered information they received.  First, during the further recross-examination of Trooper Cherven, the judge sustained the prosecutor's objection to the following question posed by defense counsel:  "My question is:  Did you think that maybe Kevin Hayes -- right after, on the Thursday or Friday after [the victim] was killed when Kevin Hayes is saying that he suspected [the defendant], did you give thought to maybe Kevin Hayes is trying to create evidence in case [the defendant], at some point, has the guts to come forward to say, Kevin Hayes killed him, and I saw it?"  The judge did not abuse her discretion in sustaining the prosecutor's objection.  The question was designed to elicit an answer that required the witness to accept an assumption not in evidence (that the defendant had "guts" to come forward) when such an answer would require surmise.  Moreover, the witness had just testified that it never had occurred to him that Hayes was implicating the defendant because Hayes was fearful that the defendant would implicate him.

No prejudicial error arose when the judge precluded defense counsel from questioning Trooper Chad Laliberte about whether

the defendant or someone else could have placed the defendant's gun in the paint can or whether Trooper Laliberte considered whether the person who put the gun in the paint can did not realize the manufacturing date of the paint can.  These questions called for the witness to engage in speculation.  See Olson v. Ela, 8 Mass. App. Ct. at 167.  Moreover, defense counsel already had elicited the information he wanted from Trooper Cherven who said that he knew, based on the date indicating when the paint can had been manufactured and based on the fact that the defendant at that time was incarcerated, that the defendant could not have been the person who placed his gun inside the paint can from which it was recovered.

No prejudicial error occurred when the judge cut off further questioning of Trooper Cherven concerning whether he thought a notation on a check indicating a loan from the victim to the defendant "could have been subterfuge to cover for the illegitimate drug transaction."  Defense counsel already had elicited that Trooper Cherven did not consider this money as relating to drugs.

vi.  Exclusion of evidence pertaining to the police investigation of Hayes's background.  The defendant argues that his Bowden defense was impaired because the judge refused to allow defense counsel to impeach Trooper Cherven "with questions as to Hayes' background that the police had themselves conveyed

to [the defendant's stepfather]." The line of questioning served to call into question Trooper Cherven's decision not to look more closely at Hayes as a suspect. Although "defendants are entitled to reasonable latitude on cross-examination, the scope of such cross-examination, including the extent of impeachment of a witness for credibility and competency, are well within the judge's sound discretion." Commonwealth v. Carrion, 407 Mass. 263, 273 (1990). Defense counsel was permitted to ask Trooper Cherven whether any background information on Hayes raised concerns or questions for him regarding Hayes's possible involvement in killing the victim. Trooper Cherven answered, "No." The judge sustained the prosecutor's objection to defense counsel's next question which asked whether Trooper Cherven had considered Hayes "[a]s far as doing anything or things that were unsavored." She acted within her discretion in so doing. The question was improper as it called for an opinion concerning what "unsavored" meant. No error occurred when the judge cut off questioning of Trooper Cherven regarding whether he had information concerning any involvement of Hayes with "mob people." Trooper Cherven testified that he had given consideration to the fact that there was information that Hayes had involvement with "bookies," and that bookies sometimes are involved in organized crime. This testimony sufficiently revealed the intimations of defense

counsel and use of the terminology "mob people" was unduly
inflammatory.

b.  Third-party culprit.  The defendant argues that
improper evidentiary rulings prejudicially obstructed his third-
party culprit defense.  The well-established principles
governing the admissibility of third-party culprit evidence are
set forth in Commonwealth v. Silva-Santiago, 453 Mass. at 800-
801, and need not be restated.  "Because the issue is one of
constitutional dimension, we are not bound by an abuse of
discretion standard, but rather examine the issue
independently."  Commonwealth v. Conkey, 443 Mass. 60, 66-67
(2004), S.C., 452 Mass. 1022 (2008).

The defendant first claims error in the judge's limitation
of questions to Trooper Cherven concerning Hayes's attempts to
"mislea[d]" the police.  As an initial matter, prior to trial,
in connection with a motion in limine, defense counsel admitted
that there were no substantial connecting links tying Hayes to
the victim's murder.  Thus, the motion judge[15] ruled that, unless
the substantial connecting link was provided by the defendant,
no third-party culprit evidence would be admissible at trial.

That showing had not been made when Trooper Cherven
testified.  Thus, there is no merit to the defendant's claim
that his third-party culprit defense was impaired by his

---

[15] The motion judge was not the trial judge.

inability to question Trooper Cherven about Hayes telling police that he "heard" that the defendant had borrowed money from the loan shark (when Hayes knew in fact that the defendant had). Further, the proffered testimony did not establish a "substantial connecting link" between Hayes and the victim's murder. The evidence was inadmissible. Commonwealth v. Bizanowicz, 459 Mass. at 418-419.

Second, the defendant claims error in the judge's limitation of his testimony concerning a third-party culprit. Once the defendant testified,[16] the defendant's testimony that he saw Hayes shoot and kill the victim provided the "substantial connecting link" under the third-party culprit doctrine to render such evidence admissible (so long as all other prerequisites to admission were met). With this point in mind, we turn to the defendant's claims of error.

The defendant asserts that the judge erroneously refused to let him testify about the content of Hayes's telephone call to him on the morning that the defendant fled. We conclude that the evidence should have been admitted, but that its exclusion, on this record, was harmless. See Commonwealth v. Rosario, 444 Mass. 550, 551 (2005). Although the content of the telephone call was not elicited, there were telephone records

---

[16] Defense counsel did not know whether the defendant would testify until after the close of the Commonwealth's evidence.

corroborating the fact that the call had been made and the defendant was permitted to testify that when he fled, he left in fear for his life and in fear for the lives of his family. Further, the defendant testified that it was Hayes who had killed the victim, threatened him just after doing so, and threatened him by racking the shotgun at him after the murder had occurred. The jury reasonably could have inferred that Hayes had threatened the defendant before he fled. The defendant does not state in what other manner the content of the telephone call would have materially aided his defense.

The defendant also claims that he should have been permitted to testify, in accordance with the third-party culprit doctrine, to how and when he learned that the murder weapon had been planted at his house, when he believed that information to be true, and to his opinion concerning who he believed planted the gun at his home. It was made known off the record that this information, in the main, derived from a letter that the defendant had sent to his stepfather when he was in jail awaiting trial. The letter was not admitted, but was marked for identification and we have reviewed it.[17]

---

[17] In the letter, the defendant tells of an encounter he had with an unknown male inmate who attacked him in the shower. The defendant wrote in the letter that he was able to obtain from this unknown person information that Hayes "did not kill [the victim], but is involved;" that Hayes told the unidentified inmate where the gun was; that before trial unidentified people

The judge correctly determined that the proffered evidence constituted inadmissible hearsay. In particular, the proffered testimony was based on inadmissible "layered" hearsay (i.e., the defendant stating what an unknown person said Hayes and other unidentified persons said). See Commonwealth v. Caillot, 449 Mass. 712, 721 (2007). "[E]vidence based on a chain of statements is admissible only if each out-of-court assertion falls within an exception to the hearsay rule." Commonwealth v. McDonough, 400 Mass. 639, 643 n.8 (1987), citing Bouchie v. Murray, 376 Mass. 524, 527-531 (1978). To the extent that the unknown inmate's statements do not offer the source of his information, the statements have no reliability. The information also amounts to nothing more than speculation. See Commonwealth v. Santos, 463 Mass. 273, 296 (2012). The defendant's testimony on these subjects was properly excluded.

In addition, the defendant's opinion concerning who had planted the gun was properly excluded because it called for speculation and was not based on personal knowledge given that the defendant was in jail at the time the gun was planted in the paint can. See Commonwealth v. Santos, supra. Further, even if the defendant had been permitted to testify how and when he learned that the gun had been planted in the paint can, how he

were going to "leak" to police that the defendant had the gun and "leak" its location; and that Hayes was "making money on it."

believed that information to be true, and who he believed planted the gun inside the paint can, that information did not inculpate Hayes as the shooter so the exclusion of this evidence would have been harmless. Last, admission of this evidence could have hurt the defendant. The unknown inmate said that Hayes had not killed the victim. See note 17, supra. The reference in the letter to Hayes's having being "involved" may have meant a cover-up after the fact or participation in the event underlying the killing (a drug transaction according to the defendant), but the reference was hardly clear. Cf. Commonwealth v. Alammani, 439 Mass. at 611-612 (judge properly excluded hearsay evidence to show that defendant's mother committed crime; evidence consisted of mother's statements which were vague and "could have had any number of meanings").

c. Consciousness of guilt. Evidence of flight, concealment, false statements to police, destruction or concealment of evidence, bribing or threatening witnesses, or similar conduct, generally is admissible as some evidence of consciousness of guilt. See Commonwealth v. Stuckich, 450 Mass. 449, 453 (2008). "[C]onsciousness of guilt, together with other evidence, may establish guilt." Commonwealth v. Epsom, 399 Mass. 254, 259 (1987), citing Commonwealth v. Porter, 384 Mass. 647, 653 (1981). When the Commonwealth has introduced consciousness of guilt evidence, a defendant may rebut it. See

Commonwealth v. Hicks, 375 Mass. 274, 277-278 (1978), and cases cited; Commonwealth v. Chase, 26 Mass. App. Ct. 578, 580-581 (1988). To the extent a defendant offers consciousness of innocence evidence, "[s]uch evidence is [typically] of little value" because of the variety of possible motives behind the conduct, Commonwealth v. Oeun Lam, 420 Mass. 615, 620 (1995), but when admitted, it is "properly left to the give and take of argument, without jury instructions." Id. at 619. The relevancy and admissibility of both types of evidence is within the discretion of the trial judge.

The defendant testified that, after he received a telephone call from Hayes on November 23, he fled to Georgia. He testified that when he left, he was in fear of his life and the lives of his family, and that he was fleeing from Hayes and not the police. He stated that he did not go to the police because he was afraid because Hayes had threatened him and his family at the time of the murder and after by racking a shotgun at him. The defendant testified that he disguised his appearance and abandoned his automobile along the way, leaving a note with it for the purpose of informing the police that they needed "to keep looking for [the victim's] killer."

The defendant argues that he should have been permitted, in rebutting the Commonwealth's consciousness of guilt evidence of his flight, to testify to the content of Hayes's telephone call

to him as well as the content of the note he had left with his automobile. He also contends that he should have been able to testify that, once arrested, he wished to speak to police. Last, he asserts that defense counsel should have been permitted to ask him and Trooper Cherven questions about the defendant's then attorney "having contacted police to raise safety concerns," which the defendant asserts was relevant to his fearful state of mind and rebutted the Commonwealth's consciousness of guilt evidence. The defendant properly preserved objections to these claims of error.

The content of Hayes's telephone call was not offered for its truth, but rather insofar as relevant to the issue raised here, to explain why the defendant fled to Georgia. On the record, however, no prejudice to the defendant resulted from the exclusion of this evidence. The jury heard that Hayes had threatened the defendant (and his family) at the time of the murder, and after it by racking a shotgun at him. The jury also heard that the defendant, shortly after receiving the call from Hayes, left the Commonwealth in a fearful state and in order to evade Hayes, not police. The jury reasonably could have inferred from this evidence that the defendant had fled, in part, due to a threat made by Hayes during that telephone call.

There was no error in the exclusion of the defendant's note, which was written after the murder and essentially

amounted to consciousness of innocence evidence.  See

Commonwealth v. Fitzpatrick, 463 Mass. 581, 602-603 (2012);

Commonwealth v. Fatalo, 345 Mass. 85, 87 (1962); Commonwealth v.

Henry, 37 Mass. App. Ct. 429, 432-433 (1994).

Similarly, the fact that the defendant wished to speak to

police on his arrest also constituted consciousness of innocence

evidence and was properly excluded.  The sincerity of the

defendant's request reasonably could be construed as unreliable.

See Commonwealth v. Martinez, 437 Mass. 84, 88 (2002)

(defendant's offer to submit to polygraph examination as

evidence of consciousness of innocence inadmissible).  The

defendant's remaining claims of error, relating to his attempts

through an attorney to have his family receive protection, fall

into this same category.[18]

The next set of errors that the defendant raises relate to

instances where the judge precluded him from explaining why he

had engaged in a scheme to plant the gun.

Some background is in order.  The defendant testified that

Hayes was the shooter.  The gun used was the defendant's, but it

was not recovered until 2009.  Following the murder and pursuant

---

[18] We add that with respect to this evidence coming in
through Trooper Cherven, the concern for the defendant's
family's safety appeared to have come from the defendant's
stepfather, and not from the defendant.  Thus, the evidence had
no bearing on the defendant's state of mind or consciousness of
innocence.

to a warrant, the police searched the defendant's home and premises, but did not recover the gun.  The Commonwealth presented evidence that the defendant had been involved in a scheme involving others to have the gun planted "back" on Hayes. See note 6, supra.  As indicated previously, Trooper Cherven testified that, based on the date the paint can had been manufactured and the fact that the defendant was incarcerated at that time, police did not believe that the defendant was the person who had placed the gun in the paint can.

The judge did not abuse her discretion in excluding a letter (mentioned supra in connection with third-party culprit evidence) that was written by the defendant to his stepfather when the defendant was in jail awaiting trial.  The letter contained layered hearsay (namely, what an unknown inmate told the defendant that Hayes had told the unknown inmate) and was inherently unreliable.  See Commonwealth v. Martinez, 437 Mass. at 88.

Nor did the judge abuse her discretion in refusing to permit the defendant to testify who he believed possessed the gun after the murder.  The defendant did not have personal knowledge of that information and the question called for speculation.  See Olson v. Ela, 8 Mass. App. Ct. at 167.

The defendant next argues that he should have been permitted to testify how he had learned of the emergence of the

gun.  The basis of his expected testimony, as revealed in the ensuing sidebar, was the information in the letter to his stepfather involving what the unknown inmate had stated that Hayes had told him.  See note 17, supra.  The judge properly excluded the evidence.  The information derived from layered hearsay and did not involve facts known to the defendant based on his personal knowledge.  Also, the information concerning how the defendant came to know of the emergence of the gun was not relevant to why he had engaged in a scheme to plant the gun on Hayes, the latter inquiry being relevant evidence to refute consciousness of guilt.  In this regard, the defendant was permitted to testify why he had engaged in the scheme, namely, that he did so in order to "put [the gun] back to where it belonged."

There is no merit to the defendant's contention that his defense counsel was impermissibly prohibited from eliciting from a former inmate, Gerald Menard, when the defendant first raised the issue of the gun emerging to corroborate the fact that the defendant did not know about the gun at an earlier date.  Menard testified that the issue first arose in letters written to him by the defendant within a week or two from when he (Menard) had been released from jail, which was in October, 2009.

The defendant claims that he should have been able to introduce statements he made to various individuals that could

have been construed as consistent with his claim of innocence. The statements either maintained that Hayes had been the killer or that the defendant had stated he was innocent or never said that he had killed the victim. The evidence was classic consciousness of innocence evidence, and the judge acted within her discretion in excluding it. See Commonwealth v. Espada, 450 Mass. 687, 698 (2008).

d. _Other evidentiary errors_. The defendant argues that other errors deprived him a fair trial. The judge did not impermissibly preclude defense counsel from asking Trooper Cherven whether the manner of the victim's killing, being repeatedly shot, indicated hatred. The question impermissibly called for speculation. See Commonwealth v. Whitehead, 379 Mass. at 656.

The defendant argues that it was error to exclude evidence of the victim's toxicology screening because the presence of certain drugs in his system at the time of his death bore on whether he was able to experience pain and suffering, thus preventing the jury from finding extreme atrocity or cruelty. A case of murder in the first degree based on extreme atrocity or cruelty may be proved by any one or more of the factors set forth in Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983). See Commonwealth v. Noeun Sok, 439 Mass. 428, 431 (2003). Here, there was significant disproportion between the means necessary

to cause death and those used, and a significant number of extensive wounds, thus establishing at least two of the Cunneen factors. The possibility that the degree of the victim's suffering may have been impaired by drug use would not have prevented the jury from finding extreme atrocity or cruelty based on these other factors. In these circumstances and on this record, no prejudice to the defendant arose.

The record belies the defendant's contention that the judge refused to allow defense counsel to question the defendant's stepfather regarding his cooperation agreement with the Commonwealth. The judge prohibited only one question and followed the governing principles set forth in Commonwealth v. Ciampa, 406 Mass. 257, 266 (1989), and Commonwealth v. Washington, 459 Mass. 32, 44 n.21 (2011). There was no error.

The defendant next contends that the judge allowed Trooper Cherven to improperly vouch for Hayes's credibility. There was no improper vouching. The full context of the exchange to which the defendant cites demonstrates that Trooper Cherven was not expressing his personal belief in Hayes's credibility, but rather summarized the fruits of the investigation. See Commonwealth v. Ahart, 464 Mass. 437, 442-443 (2013). Our conclusion applies equally to the remaining challenged testimony, noting that such testimony occurred in the context of rebutting the claims of an inadequate investigation.

The defendant's next argument is that the judge refused to permit him to answer questions and fully explain his financial relationship with the victim.  Again, the defendant fails to present the full picture of the part of the record to which he cites.  Regarding the first exchange to which the defendant objects, the defendant's answers were not responsive to the Commonwealth's questions and the judge did not abuse her discretion in attempting to move the trial along.  As to the second objectionable exchange, which occurred during redirect examination, the defendant improperly sought to introduce statements that he had made to the victim or statements that the victim had made to him.  Such statements amounted to inadmissible hearsay and were properly excluded.  See Commonwealth v. Eugene, 438 Mass. 343, 350 (2003).

2.  Defendant's closing argument.  The evidence at trial established that the victim was known to carry a pistol and not a revolver.  The defendant argues that his trial counsel's mistaken reference, in his closing argument, to the victim being known to carry a revolver as opposed to a gun or to a pistol[19] served to contradict the evidence suggesting that the victim was known to carry the defendant's .40 caliber gun.  The mistaken

_____

[19] There was no dispute at trial that the murder weapon was a .40 caliber semiautomatic pistol that was owned by the defendant.  The term "pistol" was used synonymously with the term "gun" throughout the trial.

reference, the defendant asserts, undermined his defense, prejudiced his trial, and created a substantial likelihood of a miscarriage of justice.

For claims of ineffective of assistance of counsel in a capital case, which essentially is the essence of the defendant's claim, we review pursuant to G. L. c. 278, § 33E, to determine whether there exists a substantial likelihood of a miscarriage of justice.  Commonwealth v. Marrero, 459 Mass. 235, 244 (2011), citing Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  Errors that arguably occur during the closing arguments of counsel must be "considered in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial."  Commonwealth v. Degro, 432 Mass. 319, 333-334 (2000), quoting Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 231 (1992).

Although the defendant's trial counsel initially incorrectly used the term "revolver," in the very next sentence, regarding whether the victim was licensed to carry a firearm, he referenced the term "gun."  Both terms, when viewing defense counsel's use of terminology in context, referenced the same thing, namely the firearm used by the victim.  Any possible confusion that may have arisen was cured by the judge's charge to the jury that explained that the arguments of counsel are not evidence, the jurors are to decide the case based on the

evidence, the collective recollection of the jurors of what comprises the evidence is to control, and the jurors are the sole and exclusive judges of the facts.  In these circumstances, we conclude that the isolated misstatement did not create a substantial likelihood of a miscarriage of justice.

3.  Judge's response to jury question.  During deliberations, the jury asked the judge:  "Could defense [counsel] have called Kevin Hayes as a witness?"  Over the defendant's objection, the judge replied:  "Jurors, if available, a witness can be called by either party.  However, a defendant is not required to produce evidence, as the burden of proof is on the Commonwealth, the prosecution."[20]

The defendant contends that the jury's question had no relevance or application unless the jury sought to determine whether the defense had an option to call Hayes and, if so, to ascribe weight to the defendant's failure to produce him at trial.  As a result, the defendant argues that the judge's response improperly permitted the jury to draw a negative inference against the defendant for his failure to call Hayes, and improperly placed a burden on the defendant to produce evidence.  Last, the defendant asserts that the error was

_____

[20] Defense counsel preferred the judge's initial proposed response, namely that she could not "inquire of the defense as to whether they could call any witnesses."  Such a statement, however, is not accurate or complete.

compounded by repeated improper burden-shifting remarks made by the prosecutor in his closing argument.

"The proper response to a jury question must remain within the discretion of the trial judge, who has observed the evidence and the jury firsthand and can tailor supplemental instructions accordingly." Commonwealth v. Monteagudo, 427 Mass. 484, 488 (1998), quoting Commonwealth v. Waite, 422 Mass. 792, 807 n.11 (1996). "[B]efore a judge responds to a jury communication of legal significance . . . , counsel should be given the opportunity to assist the judge in framing an appropriate response and to place on record any objection they might have to the course chose by the judge." Commonwealth v. Floyd P., 415 Mass. 826, 833 (1993). The judge's additional instructions "must be read in light of the entire charge," and the judge is "not required to repeat all aspects of [her] prior charge." Commonwealth v. Sellon, 380 Mass. 220, 233-234 (1980).

Here, the jury's question, and the judge's response, took on significance because at trial the judge declined to give the defendant's missing witness instruction regarding Hayes because the Commonwealth had legitimate tactical reasons for not calling him and he had been equally available to both sides, but neither

side wished to call him.[21]  See Commonwealth v. Salentino, 449

Mass. 657, 668 (2007); Commonwealth v. Figueroa, 413 Mass. 193,

199 (1992), S.C., 422 Mass. 72 (1996).  She permitted, however,

defense counsel to comment on the Commonwealth's failure to call

him as a witness, which he did.  This was error.  Commonwealth

v. Salentino, supra at 671 (if judge determines missing witness

adverse inference is not appropriate in case, jury should not,

whether by way of instruction or argument, be given option of

drawing inference).  No prejudice arose to the defendant,

however, because he "got more than he was entitled to in the

first place."  Id. at 672.

In these circumstances, the judge's response did not

prejudice the defendant.  The judge followed appropriate

procedures by consulting with counsel.  Her supplemental

instruction, when viewed in light of the entire charge, would

not have resulted in shifting the burden of proof to the

defendant and would not have permitted the jury to draw an

adverse inference against the defendant for not calling Hayes as

a witness.  In her supplemental instruction and repeatedly in

her earlier charge to the jury, the judge forcefully instructed

---

[21] The underlying reasons concerning the Commonwealth's
decision were not expressly stated on the record, nor was any
explanation given concerning Hayes's availability.

the jury that the Commonwealth bore the burden of proof.[22]
Although the usual practice is for a judge expressly to instruct
the jury not to draw inferences from the failure of a defendant
to call a witness, see Commonwealth v. Franklin, 366 Mass. 284,
293 (1974), quoting Commonwealth v. Finnerty, 148 Mass. 162, 167
(1889), and that would have been the better practice here, a
reasonable juror would not have construed the judge's
instructions as permitting the jury to draw such an inference.
We add also that the jury would not have known whether Hayes had
been "available" to have been called.  Thus, the jury could not
have inferred that he was available to be called by the defense
to testify.  Examining the supplemental instruction in light of
this factor and the circumstances, as well as the charge as a
whole, we conclude that no prejudicial error occurred.

We consider next whether the judge's response to the jury
question was compounded by alleged improper burden-shifting

----

[22] In her earlier charge, the judge also instructed as
follows:

> "Jurors, the defendant in this case, as in every
> criminal case, is presumed innocent.  You as jurors must
> bear in mind that the law never imposes on a defendant in a
> criminal case the burden or the duty of calling any witness
> or indeed of presenting any evidence whatsoever.  This
> legal presumption of the defendant's innocence is not an
> idle theory to be discarded or disposed of by the jury by
> caprice, passion, or prejudice.  Furthermore, the defendant
> is not to be found guilty of these charges on suspicion or
> conjecture, but only on evidence produced and admitted
> before you, the jury, in this courtroom; evidence which
> establishes his guilt by proof beyond a reasonable doubt."

language in the prosecutor's closing argument.  The defendant

challenges the following statements of the prosecutor:

> "Now we get to the critical time frame. . . .  If somehow you think [that the defendant's] telling the truth about that . . .  now we hear, 'Oh, Kevin Hayes is outside.'  Again, the defendant absolutely doesn't have to prove anything.  This is the burden of the Commonwealth.  This is what this country is all about.  But he got up there and can't prove that.  Kevin Hayes."

> "Car's backed in.  November night.  Windows down.  Consistent with someone knowing the person?  Victim sitting in the seat.  Someone smoking outside, I would ask you to find.  Notice how [the defendant] conveniently says, 'I left five to six cigarettes there.  I was smoking.'  He knows that [a] cigarette was there.  Chief Walsh said it could have been up to a day.  It is not unreasonable for you to find, in fact very reasonable, he is puffing his Parliament Lights, not Parliament, chatting with the victim.  The victim's at ease, or sitting in his car.  He's got the murder weapon, knows how to use it. . . .  The only evidence of anything going on in that parking lot is him smoking and the victim executed.  There's no evidence of Kelly Croce or Kevin Hayes or whoever he wants; the Outlaws."

> "There's not one shred of credible evidence [that] Kevin Hayes was involved in anything.  There's not one -- the fact that [the loanshark] said, 'Oh, you ought to look at Kevin Hayes.'  Said he was kidding.  This is his sister whose husband was murdered.  Because he didn't like him or said, 'I don't like the guy,' he's going to kill him?  That is a smoke screen and a diversion, which is what [the defendant] is all about.  There is no evidence."

The defendant did not object to these statements at trial.  We

therefore review to determine whether the statements were

improper, and if so, whether they created a substantial

likelihood of a miscarriage of justice.  Commonwealth v.

Francis, 450 Mass. 132, 140 (2007).  "We consider the remarks in

the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial."  Id., citing Commonwealth v. Yesilciman, 406 Mass. 736, 746 (1990).

Generally, a prosecutor "cannot make statements that shift the burden of proof from the Commonwealth to the defendant." Commonwealth v. Amirault, 404 Mass. 221, 240 (1989).  Such burden shifting typically arises where a prosecutor offers direct comment on the defendant's decision not to testify, see Commonwealth v. Feroli, 407 Mass. 405, 409 (1990), quoting Commonwealth v. Storey, 378 Mass. 312, 324 (1979), cert. denied, 446 U.S. 955 (1980), or "calls the jury's attention to the defendant's failure to call a witness or witnesses, or . . . 'to contradict testimony.'"  Commonwealth v. Tu Trinh, 458 Mass. 776, 787 (2011), quoting Commonwealth v. Miranda, 458 Mass. 100, 117 (2010), cert. denied, 132 S. Ct. 548 (2011).  In these cases "the prosecution is signaling to the jury that the defendant has an affirmative duty to bring forth evidence of his innocence, thereby lessening the Commonwealth's burden to prove every element of a crime."  Commonwealth v. Tu Trinh, supra.  A prosecutor, however, "is entitled to emphasize the strong points of the Commonwealth's case and the weaknesses of the defendant's case."  Commonwealth v. Feroli, supra.

We conclude that the remarks were a proper reflection on the weakness of the defendant's case.  See Commonwealth v.

<u>Bregoli</u>, 431 Mass. 265, 275-276 (2000).  In addition, the remarks must be reviewed in the context of the trial, in which the defendant testified to the fact and argued that Hayes had in fact committed the murder.  The prosecutor's remarks were an attempt to meet the Commonwealth's essential burden "to prove beyond a reasonable doubt that the third-party culprit did not commit the crime."  <u>Commonwealth</u> v. <u>Silva-Santiago</u>, 453 Mass. at 801.  Cf. <u>Commonwealth</u> v. <u>Williams</u>, 450 Mass. 879, 889 (2008) (prosecutor's comments were attempt to meet Commonwealth's burden of disproving self-defense).  Even if the remarks crossed the line, no substantial likelihood of a miscarriage of justice arose because the judge instructed the jury repeatedly that the Commonwealth bore the burden of proof, the defendant has no burden of producing any evidence or witnesses and is presumed innocent, and that the arguments of counsel are not evidence.  See <u>Commonwealth</u> v. <u>Tu Trinh</u>, 458 Mass. at 788; <u>Commonwealth</u> v. <u>Bregoli</u>, <u>supra</u> at 276.  Further, "[t]he fact that the defendant did not object, '[a]lthough not dispositive of the issue . . . is some indication that the tone [and] manner . . . of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial.'"  <u>Commonwealth</u> v. <u>Mello</u>, 420 Mass. 375, 380 (1995), quoting <u>Commonwealth</u> v. <u>Sanchez</u>, 405 Mass. 369, 375 (1989).

4.  Review pursuant to G. L. c. 278, § 33E.  We discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

Judgment affirmed.