## Commonwealth vs. Horace Bowden.

Suffolk.   October 4, 1979. — January 9, 1980.

Present: Hennessey, C.J., Braucher, Kaplan, Liacos, & Abrams, JJ.

*Homicide. Arrest. Probable Cause. Search and Seizure. Constitutional Law,* Search and seizure. *Identification. Practice, Criminal,* Instructions to jury. *Evidence,* Alibi, Nonexistence of evidence.

At a criminal trial, evidence that a cab driver who witnessed a shooting gave the police the address of an apartment at which the assailant might be found and a detailed description of the assailant, that the police observed the defendant, while approaching the apartment, acting in a suspicious manner, that the defendant matched the description given by the eyewitness, and that the defendant refused to answer the door when the police knocked and announced their presence warranted a finding that the police had probable cause to arrest the defendant, and a search of the defendant incident to the arrest was constitutionally valid. [475-477]

Where a police officer participating in the arrest of a defendant in his apartment observed numerous shell casings on the floor of the cellar which he could see through an open door and, upon a security check of the cellar to ensure that there were no persons concealed there, he discovered a gun, both the casings and the gun were admissible in evidence. [478]

At a murder trial, the judge did not err in refusing to suppress a pretrial identification of the defendant by an eyewitness who was brought to the police station two hours after the murder and after the defendant had been arrested and who was shown the defendant sitting alone in a detention cell. [478-479]

In the circumstances, failure of a judge to charge the jury on alibi evidence in accordance with the instruction suggested in *Commonwealth* v. *McLeod,* 367 Mass. 500 (1975), when requested to do so by the defendant was error requiring reversal. [480-482]

A defendant who fairly raised the issue of mistaken identification was entitled to an instruction regarding identification testimony. [482-484]

At a murder trial, there was no error in the judge's charge on the reasonable doubt standard. [484]

In the circumstances, the judge in a criminal case erred in instructing the jury that the nonexistence of certain scientific tests and other evidence was not to be considered in reaching a verdict. [485-486]

INDICTMENTS found and returned in the Superior Court on November 14, 1975.

Pretrial motions were heard by *Irwin, J.*, and the cases were tried before him.

*Robert L. Sheketoff* for the defendant.

*Kevin F. Driscoll,* Assistant District Attorney (*Michael J. Traft,* Assistant District Attorney, with him) for the Commonwealth.

LIACOS, J. The defendant, Horace Bowden, was tried before a Superior Court judge and a jury. He was found guilty of murder in the first degree and of unlawfully carrying a handgun on his person. He was sentenced to imprisonment for his natural life on the first degree murder conviction and to a term of not less than two and one-half nor more than five years at the Massachusetts Correctional Institution at Walpole on the firearms conviction, to be served concurrently with the murder sentence. He appeals under G. L. c. 278, §§ 33A-33G, assigning as error various rulings on pretrial motions, jury instructions and admissibility of evidence. We reverse.

The facts disclosed at trial were as follows. On the evening of April 23, 1975, Frank Colvin was shot to death on the corner of Dearborn and Zeigler Streets in Boston. The police officers who arrived at the scene found two spent bullets, one next to the body and the other embedded in a window casing some distance away. The police questioned a cab driver who was sitting in his cab parked near the scene of the shooting. The driver, Jose Fernandes, also known as Jose Soares, had transported a passenger from 88 Brook Avenue to the corner of Dearborn and Zeigler Streets. Fernandes-Soares saw the man who had just been a passenger in his cab shoot the victim five or six times. He gave the police who arrived at the scene a description of the assailant.

The police officers went to 88 Brook Avenue and found the house locked. No one responded to their knock. These officers left and returned to District 2 headquarters. Shortly thereafter, the officers returned to 88 Brook Avenue to

stake out the building. Several minutes later a cab came up Brook Avenue, and the officers observed that one of the two passengers, a male, appeared to look up and down the street. The cab then proceeded to 88 Brook Avenue, where it stopped and discharged two passengers, a female and a male who fit the description given by Fernandes-Soares.

After calling for and receiving additional police assistance, the officers knocked on the door, identified themselves as police officers and demanded entrance. It was not until the officers struck the door with a sledge hammer that their presence was acknowledged. The door was opened by the man the police saw entering the building, the defendant Bowden. After informing the defendant that he was sought for questioning in connection with a murder that had taken place shortly before, the officers searched the defendant for weapons. Four .38 caliber bullets were found in the pocket of a jacket he was wearing. He was arrested and read his Miranda rights.

While the officers were arresting the defendant, two other police officers conducted a search of the premises. One, an Officer Martin, proceeded down a hall where a woman was standing. He came on a partially opened door which led to a lighted cellar staircase. Observing what appeared to be ammunition at the foot of the stairs, Officer Martin went down the stairs into the basement. He seized several shell casings and proceeded to look behind objects that might conceal a person. Removing a tire in front of a "cubby area," Officer Martin saw a .38 caliber revolver in the tire. The gun was seized.

Following his arrest, the defendant was taken to District 2 headquarters where he was placed in a detention room. Fernandes-Soares, who was present at the station, was asked to look into the detention room. At different stages of the judicial proceedings, Fernandes-Soares gave radically inconsistent statements regarding his stationhouse identification of the defendant as the assailant.[1] At trial Fer-

---

[1] In addition to his vacillating testimony regarding his ability to identify the defendant, Fernandes-Soares' testimony regarding the description he had given the police varied.

nandes-Soares did testify that he positively identified the
defendant when he looked in the detention room.

1. *Pretrial Motions.*

We first consider the defendant's assignments of error
relative to the trial judge's denial of his pretrial motions.
The defendant contends that the trial judge erred in (1)
denying his motion to suppress evidence and (2) denying his
motion to suppress identification testimony.

A. *Motion to suppress evidence.* The defendant filed a
motion to suppress evidence seized as a result of a warrant-
less search of his person and residence. The judge filed a
statement of findings and rulings on the motion which indi-
cates that three searches had been made: a pat-down search
of the defendant, a search of the basement of 88 Brook Ave-
nue, and a search of the second floor of 88 Brook Avenue.
The judge denied the motion to suppress as it pertained to
the first two searches, but he allowed the motion in regard
to the third search. Thus, the bullets found on the defend-
ant's person were allowed in evidence, as were the shell cas-
ings and the .38 caliber revolver found in the basement.
Other guns and ammunition found during the search of the
second floor were suppressed.

The defendant challenges the denial of his motion to sup-
press and the admission in evidence of the bullets and the
revolver on two grounds. First, he claims the arrest was il-
legal because the police did not have probable cause to ar-
rest, and any evidence seized after the invalid arrest must be
suppressed. Secondly, he claims that even if the police had
probable cause to arrest, the warrantless search of his apart-
ment was beyond the scope of a permissible search incident
to a valid arrest.

The facts as found by the judge indicate that the police
had probable cause to arrest the defendant. The judge
summarized the facts as follows: "A person who had wit-
nessed the shooting gave the police a detailed description of
the alleged assailant.[2] He also told police an address at

---

[2] The defendant argues that there was no evidence offered at the hear-
ing on the motion to suppress which showed that the cab driver witnessed
the shooting. (Such evidence was later presented at trial.) There was tes-

which the assailant might be found. Acting upon this information, the police proceeded to Brook Avenue. While at Brook Avenue, they observed the defendant approach the apartment in a taxi cab. He made some suspicious movements in the cab which seemed to indicate he was concerned as to who might be on the street. When he got out of the cab, the police observed that he matched, in every detail, the description given by the eyewitness. When they knocked on the door and announced their presence as police officers, they received no response even though the police knew the defendant was in the apartment. They also observed someone looking at them from behind the shades."

The judge's subsidiary findings of fact are supported by the evidence before him, and we accept them. *Commonwealth* v. *Valliere,* 366 Mass. 479, 486 (1974). Probable cause to arrest has been defined as facts and circumstances within the knowledge of the police and of which they had trustworthy information which were "sufficient to warrant a prudent man in believing that the . . . [defendant] had committed . . . an offense." *Commonwealth* v. *Perez,* 357 Mass. 290, 300 (1970), quoting from *Beck* v. *Ohio,* 379 U.S. 89, 91 (1964). When hearsay is the basis of action by the police, as it was in the instant case when the police relied on the information of the cab driver, the police must show a substantial basis for crediting the hearsay. *Commonwealth* v. *Stevens,* 362 Mass. 24 (1972). *Stevens* drew on *Aguilar* v. *Texas,* 378 U.S. 108, 112-116 (1964), in holding that credibility is established by meeting two requirements: "(1) there should be underlying facts and circumstances indicating the informant's reliability, and (2) there should be underlying facts and circumstances on which the informant bases his

timony at the hearing, however, that the cab driver was parked at the scene when the arresting officer, Flaherty, arrived moments after the shooting. The driver gave Sergeant DeLosh, who had arrived with Officer Flaherty, a detailed description of the assailant and an address at which the assailant might be found. Thus, sufficient evidence was offered at the hearing to support the inference made by the judge that the cab driver had witnessed the shooting.

information that the defendant is engaged in criminal activity." *Commonwealth* v. *Stevens, supra* at 27.

The defendant argues that the Commonwealth failed to produce evidence that the hearsay was credible under the two-pronged test set forth above. While it is true that the underlying facts and circumstances upon which the cab driver based his information were not brought out during the hearing on the motion to suppress, we conclude, nonetheless, that the motion was properly denied. First, the cab driver was not an "informant," but was instead an ordinary citizen. As was stated in *Commonwealth* v. *Martin,* 6 Mass. App. Ct. 624, 628 (1978), "'persons who supply information only after being interviewed by police officers, or who give information as witnesses during the course of an investigation, are not informers.'" Unlike the anonymous informer, Fernandes-Soares was an ordinary citizen who witnessed a violent crime and as such could be regarded as reliable without any prior demonstration of his reliability. See *United States* v. *Rueda,* 549 F.2d 865, 869 (2d Cir. 1977), collecting cases holding that the requirement of known reliability should be relaxed when dealing with eyewitnesses and participants in a crime.

Second, there was evidence presented at the hearing which showed corroboration of the cabdriver's information by independent sources. *Commonwealth* v. *Stevens,* 362 Mass. 24, 27 (1972), as well as *Spinelli* v. *United States,* 393 U.S. 410, 415-416 (1969), hold that even if an informant's tip cannot meet the *Aguilar* criteria, the constitutional requirements are met if the tip is corroborated by other sources. See *Draper* v. *United States,* 358 U.S. 307, 313 (1959). We conclude the arrest was founded on probable cause and hence was lawful.

The police had the authority to conduct a search of the defendant incident to this lawful arrest. See *Chimel* v. *California,* 395 U.S. 752 (1969). Thus, the search of the defendant's person was constitutionally valid, and the judge appropriately denied the defendant's motion to suppress the .38 caliber bullets discovered in that search.

The judge made the following determinations concerning Officer Martin's search of the cellar which resulted in the discovery of numerous shell casings and a .38 caliber revolver: "Officer Martin was unaware of how many people were involved in the crime and of how many people were actually in the apartment. He testified that he saw the open door and the light on, as well as the numerous shells on the floor; and he believed there might be someone hiding in the basement. He went downstairs to investigate and looked behind all objects and into all areas large enough to conceal a person. His testimony was that he did this to ensure the safety of himself and the other officers. During this search he discovered a .38 caliber revolver which fell out of a tire which Officer Martin was moving."

Officer Martin was participating in a lawful arrest. He was authorized to be standing in the hallway at the time he looked through the open cellar door and saw the numerous shell casings on the cellar floor. These shell casings were in plain view and were lawfully seized. See *Harris* v. *United States*, 390 U.S. 234, 236 (1968).

The seizure of the .38 caliber revolver from the basement presents a different question. This court has recognized that, subsequent to an arrest, a security check of other rooms in a dwelling is valid in the interest of insuring the safety of the police. *Commonwealth* v. *Walker*, 370 Mass. 548, 556, cert. denied, 429 U.S. 943 (1976). The defendant contends that Officer Martin's search of the basement cannot be justified as a permissible security check to ensure the safety of the officers because two of the arresting officers "knew" that no persons other than the defendant and his female companion were inside the dwelling.

We do not accept the defendant's assessment of the officers' knowledge at the time of the search. The judge found that a security check was reasonably believed necessary by the police to ensure their personal safety. We agree. There was no error.

B. *Motion to suppress identification testimony.* The defendant filed a separate motion to suppress identification

testimony. After hearing, the judge's findings on this motion were as follows: "While on the scene investigating an apparent murder, the police spoke with an eyewitness to the crime, one Jose Soares, a/k/a Jose Fernandez. The witness had driven the alleged assailant to the scene of crime and had witnessed the murder. He gave the police a detailed description of the alleged assailant and told them where he had picked him up in his cab. Approximately two hours after the murder, and after the defendant had been arrested, the police brought Mr. Soares to the police station. The police told Mr. Soares to look through the window of the detention cell in which the defendant was sitting alone to see if he could identify the defendant. Mr. Soares did this.* A short time later the sergeant in charge asked Mr. Soares to look again in order to be certain of his prior identification. Again Mr. Soares looked through the window."

While the identification was made as the result of a disfavored one-on-one confrontation (*Stovall* v. *Denno,* 388 U.S. 293, 302 [1967]; *Commonwealth* v. *Nolin,* 373 Mass. 45, 51 [1977]), we agree with the judge that this showup was permissible. "[O]ne-on-one confrontations . . . while often disfavored, are not subject to a rule of per se exclusion" (citations omitted). *Commonwealth* v. *Storey,* 378 Mass. 312, 317 (1979). "[S]howups of suspects to eyewitnesses of crimes have been regularly held permissible when conducted by the police promptly after the criminal event." *Commonwealth* v. *Barnett,* 371 Mass. 87, 92 (1976), cert. denied, 429 U.S. 1049 (1977). There were "no . . . special elements of unfairness" shown in this procedure, *Barnett, supra* at 93, and the judge properly ruled that there was nothing in the facts of this case to take it out of the class of cases permitting a confrontation without a lineup. There was no error in the denial of the motion.

---

* "There is some confusion as to whether Mr. Soares had his eyes open at this time as well as during the second view. However, what is in question here is not whether Mr. Soares actually identified the defendant but the procedure used by the police in bringing about the confrontation."

2. *Jury Instructions.*

We next consider the defendant's assignments of error relative to the judge's instructions to the jury. The defendant contends that the judge erred (1) in instructing the jury on the issue of alibi; (2) in refusing to give the defendant's requested jury instruction concerning identification testimony; (3) in instructing the jury on the reasonable doubt standard; and (4) in instructing the jury regarding the nonexistence of evidence.

A. *Jury instructions regarding alibi.* The defendant requested that the jury be instructed on the issue of alibi in accordance with the instruction suggested in *Commonwealth* v. *McLeod,* 367 Mass. 500, 502 n.1 (1975).[3] The judge refused to give it, and instead instructed the jury that the defendant had invoked the "defense" of alibi, that the jury should "scrutinize it very carefully," because it is "sometimes easily fabricated," "is difficult to disprove, and it is usually attested to by friends or relatives of the accused." The judge further instructed the jury that it was up to them "to find out where the truth lies" and to determine "who you believe and who you don't believe." The defendant excepted to this instruction and we now consider whether it was error.

In *Commonwealth* v. *Williams,* 378 Mass. 242 (1979), a case tried two years prior to the *McLeod* decision, the defendant argued that the judge erred because (1) the charge improperly placed on him the burden of persuasion on alibi and (2) the charge singled out alibi evidence for rigid scrutiny and failed to point out that an alibi may be the only

[3] The requested instruction was as follows:

"Evidence has been introduced tending to establish an alibi, which amounts to a contention that the defendant was not present at the time when or at the place where he is alleged to have committed the offense charged in the indictment. If, after consideration of all the evidence in the case, you have a reasonable doubt as to whether the defendant was present at the time and place the alleged offense was committed you must acquit him. The jury will bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence."

refuge for the innocent. The defendant in the case at bar makes identical claims.

In *Williams*, the defendant's failure to make an objection at trial was fatal to his claim. See *McLeod, supra* at 501-502, and *Commonwealth v. Palmarin*, 6 Mass. App. Ct. 801, rev'd on other grounds, 378 Mass. 474 (1979), where the defendants failed to take exception to the alibi instruction. This court in *Williams*, while declining to "review the merits of an assignment of error not based on an exception" (*id.* at 242-243), did note that the judge reiterated the proper burden of proof standard many times during the charge, and that there was no reasonable likelihood that the charge taken as a whole could have led the jury to ignore the reasonable doubt test. Likewise in *Palmarin* the court noted that "there was sufficient emphasis placed upon the Commonwealth's burden of proof to mitigate the effect of the *Webster* language quoted in the charge." *Palmarin, supra* at 804.

In the case at bar the judge also reiterated the burden of proof standard many times during the charge. Significantly, one of these references was made immediately preceding the judge's comments concerning alibi evidence, another in the middle and a third immediately after. Thus, while the judge improperly referred to the "defense" of alibi which "attempts to prove another fact which is inconsistent with the defendant's participation in the crime," this possible burden-shifting language was mitigated by the repeated references to the Commonwealth's bearing the burden of proof.

As to the defendant's contention that the judge erred in singling out alibi evidence for rigid scrutiny while failing to mention that an alibi may be the only "refuge for the innocent," this must be considered along with the possible burden-shifting language quoted above to determine whether the alibi charge was prejudicial. *Commonwealth v. Ramey*, 368 Mass. 109 (1975). While the defendant never explicitly requested the "refuge of the innocent" language, he did point out to the judge the inappropriateness of calling attention to alibi evidence and suggesting that it be scrutinized. In *Williams*, a case tried two years prior to the

*McLeod* decision, we did not reach the issue of failure to include "refuge of the innocent" language because of the defendant's failure to take an exception at trial. *Williams, supra* at 242-243. However, we noted in *Williams* that "in *Commonwealth* v. *Cobb,* 5 Mass. App. Ct. 421, 423-424 (1977), dealing with a case tried over one year after our *McLeod* and *Ramey* decisions, the Appeals Court reversed a conviction primarily because the charge did not conform to the directions of this court in the *McLeod* and *Ramey* opinions. The Appeals Court specifically noted that '[t]here has been ample time since those cases were decided for trial judges to modify their charges on alibi evidence.' *Commonwealth* v. *Cobb, supra* at 425." *Williams, supra* at 244-245.

The case at bar, like *Cobb,* was tried over a year after the *McLeod* and *Ramey* decisions, thereby giving the judge "ample time . . . to modify" his charge. The Appeals Court correctly perceived in *Cobb* that our warnings in *McLeod* and *Ramey* were not mere academic exercise. Failure of the judge in the case at bar to charge the jury on alibi evidence in accordance with the directions given by this court, when requested to do so, was error requiring reversal.

B. *Jury instruction regarding identification testimony.* We next consider the defendant's contention that the judge erred in refusing to give the defendant's requested jury instruction regarding identification testimony.[4] While the trial judge's refusal to give the requested instruction in that form may have been entirely appropriate,[5] we conclude

---

[4] The requested instruction was as follows: "The only direct evidence in this case offered by the Commonwealth to convict the defendant with [sic] the shooting of Frank Colvin was through the testimony of Jose Soares. Before you may find defendant guilty, however, you must be satisfied that this identification of him by Mr. Soares was of sufficient certainty to rule out any reasonable possibility of mistake. Identification testimony must be considered by you with extreme care, because no class of testimony is more uncertain or more unreliable. The possibility of human error or mistake must be kept in mind at all times, and you must find the defendant not guilty if you have any reasonable doubt as to the accuracy or truthfulness of Mr. Soares' identification of him."

[5] The requested instruction was possibly misleading in its reference to the testimony of Fernandes-Soares being the only "direct evidence" of-

that the defendant was entitled to some instruction on identification testimony.

In *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 302 (1979), we noted that "[a]lthough the judge gave detailed instructions to the jury on the subject of 'how do we decide who[m] we believe,' he failed entirely to mention that the victim might honestly have been mistaken in her identification of the defendant. This tended at least to submerge one of the crucial issues in the case . . . . [A]lthough we predicate our finding of error on the fact that the instructions given were one-sided and incomplete, a defendant who fairly raises the issue of mistaken identification might well be entitled to instructions of the type here requested."

The judge in the case at bar also gave the jury detailed instructions on how to "decide who[m] you believe," without mentioning the possibility of mistaken identification of the defendant. Furthermore, the prior inconsistent statements of the identifying witness on the issue of identification heighten the need for an instruction on possible mistaken identification. See *United States* v. *Telfaire*, 469 F.2d 552, 555 (D.C. Cir. 1972).

The First Circuit Court of Appeals has also indicated that a requested charge on the possibility of mistaken identification should be given in a case where "[t]he trustworthiness of the eyewitness identifications was an important factual issue for the jury to resolve." *United States* v. *Kavanagh*, 572 F.2d 9 (1st Cir. 1978).

In view of the substantial precedent favoring an instruction concerning identification testimony where the issue is

---

fered by the Commonwealth. The statement, although not inaccurate, was misleading in some degree since the remaining evidence offered by the Commonwealth was circumstantial rather than direct (i.e., the gun, bullets, jacket, etc.). The requested instruction further states that the defendant must be found not guilty if the jury have any reasonable doubt as to the testimony of Fernandes-Soares. This is fallacious in that the jury could conceivably disbelieve Fernandes-Soares and still be convinced of guilt beyond a reasonable doubt on the basis of the other evidence presented by the Commonwealth.

fairly raised,[6] we conclude that the defendant in the case at bar was entitled to such an instruction. See *Rodriguez, supra* at 310-311, App., for a model instruction.

C. *Jury instruction regarding the reasonable doubt standard.* The defendant alleges that the judge's use of an example of the presence of the newspaper on his doorstep in the morning forming the basis for an inference that the newsgirl delivered the paper trivialized the instructions on the reasonable doubt standard. This example was used to illustrate the drawing of inferences, not to explain the reasonable doubt standard. Although in his discussion of inference-drawing the judge used some confusing language about reasonable doubt, that language appears to speak to the certainty with which an inference might be believed rather than the prosecution's burden of proof. The judge's explanation of the reasonable doubt standard which begins some seven pages later in the transcript appropriately stresses the prosecution's burden and is consistent with the charge approved in *Commonwealth* v. *Ferreira,* 373 Mass. 116 (1977).

---

[6] In *United States* v. *Kavanagh,* 572 F.2d 9, 11-12 (1st Cir. 1978), the court surveyed the decisions of the Circuit Courts on this issue: "In *United States* v. *Barber, supra,* 442 F.2d at 528 [cert. denied, 404 U.S. 958 (1971)], the Third Circuit first spelled out the necessary elements of an identification charge. . . . Drawing from *United States* v. *Barber,* the Court of Appeals for the District of Columbia similarly established a model charge to be routinely given when the evidence demonstrates a danger of misidentification. *United States* v. *Telfaire,* 152 U.S. App. D.C. 146, 152, 469 F.2d 552, 558 (1972). . . . That approach has been followed by the Seventh and Fourth Circuits, both of which have announced that they will view the failure to give an identification instruction with 'grave concern.' *United States* v. *Hodges,* 515 F.2d 650, 653 (7th Cir. 1975); *United States* v. *Holley,* 502 F.2d 273, 275 (4th Cir. 1974). Four of the remaining circuits have approved the concept of giving a special identification charge in appropriate circumstances, but have vested broad discretion in the district courts to frame the language and content of it. *United States* v. *Dodge,* 538 F.2d 770, 784 (8th Cir. 1976) [cert. denied sub nom. *Cooper* v. *United States,* 429 U.S. 1099 (1977)]; *United States* v. *Masterson,* 529 F.2d 30, 32 (9th Cir.) [cert. denied, 426 U.S. 908 (1976)]; *United States* v. *O'Neal,* 496 F.2d 368, 373 (6th Cir. 1974); *United States* v. *Fernandez,* 456 F.2d 638, 644 (2d Cir. 1972). Only the Tenth Circuit has declined to endorse a particularized identification charge. *McGee* v. *United States,* 402 F.2d 434, 436 (10th Cir. 1968) [cert. denied, 394 U.S. 908 (1969)]" (footnotes omitted).

D. *Jury instruction regarding the nonexistence of evidence.* The judge instructed the jury that the nonexistence of certain scientific tests and other evidence was not to be considered in reaching a judgment. The defendant saved his exceptions. The defendant contends that in addition to his alibi evidence, his presentation at trial concentrated on raising inferences that the Boston police had contrived much of the case against him. The defendant further asserts that the failure of the police to conduct certain scientific tests was emphasized by the defense in order to call into question the integrity of the police investigation.

After the testimony regarding the nonexistence of certain scientific tests and other evidence had been presented, a bench conference was held at which time the judge stated as follows to defense counsel: "[I]t is my observation in the course of the trial . . . that you have undertaken a line of cross-examination with several witnesses, asking them were these tests performed, and were those tests performed, and so on and so forth. . . . I would hope that . . . you are not going to argue that type of questioning has any probative value because I am certainly going — if you do — I am certainly going to instruct the jury that no evidence is exactly that. No evidence. . . . I don't think you can say that a lack of evidence exists primarily because something wasn't done scientifically. That's the point I am trying to make to you."

The judge's instructions to the jury reflected his sentiments expressed above.[7] We conclude that the instructions given constituted error requiring reversal. The failure of the authorities to conduct certain tests or produce certain

---

[7] He instructed the jury as follows: "[Y]ou have here questions asked in cross-examination that point to the absence of a particular type of evidence. 'Did you do this; isn't it a fact that,' and if the answer is in the negative, it is not in evidence before you. In other words, the lack of evidence or the non-existence of a certain type of evidence is certainly not to be considered by you as any evidence in this case. And I will point out that to you right now and get into it in much more detail later on.

"The Commonwealth has the burden of proving the guilt of the defendant beyond a reasonable doubt, and . . . they try to prove it with the evidence they offer here to you; and if you are satisfied that they have

evidence was a permissible ground on which to build a defense in the circumstances of this case. *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 308 (1979). Cf. *Commonwealth* v. *Pettie*, 363 Mass. 836, 840-841 (1973). The fact that certain tests were not conducted or certain police procedures not followed could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors. The judge should not have removed this evidence from the jury's consideration, and in so doing invade the province of the jury to decide what inferences to draw from certain evidence. *Commonwealth* v. *Cote*, 5 Mass. App. Ct. 365, 370 (1977).

3. *Evidentiary Rulings.*

Defendant has argued a number of errors arising from certain evidentiary rulings of the judge. Since we have concluded that a new trial is required because of errors in the charge given, and since the alleged evidentiary rulings are not likely to recur on a new trial, we need not consider these additional claims of error.

4. *Conclusion.*

The judgments are reversed, the verdicts are set aside, and the case is remanded to the Superior Court for further proceedings in accordance with this opinion.

*So ordered.*

---

proved that to you, then the fact that some other evidence is not in the case should obviously not be a consideration of yours."

Later in his instruction the judge again stated: "[T]here was one example where- the counsel for the defendant asked about the lack of fingerprint evidence, was there any fingerprints. What I am trying to suggest to you is this. A case, a criminal prosecution rises or falls, if you want to use that phrase, on the evidence that is before you, and the fact that something wasn't done or non-evidence is not, quite obviously, to be considered by you in connection with making your judgment. You make your judgment about the evidence that is in fact before you in the case, not something that wasn't done.

"So I hope I am clear on that. The fact that some evidence is not before you with respect to fingerprints or any other kind of scientific test obviously has no bearing on your judgment in connection with this case. Your judgment is on an affirmative basis. You decide whether or not the evidence before you is the evidence that persuades you to [*sic*] beyond a reasonable doubt the defendant is guilty, and nothing else, or his lack of guilt. So I wanted to make that clear and quite obviously it shouldn't be of any consideration for you people."