NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10975

COMMONWEALTH vs. MAXWELL WIGGINS, JR.
(and twenty-eight companion cases[1]).


Hampden.     February 10, 2017. - September 6, 2017.

Present:  Gants, C.J., Hines, Lowy, & Budd, JJ.[2]


Homicide.  Home Invasion.  Robbery.  Evidence, Identification,
    Cross-examination by codefendant's counsel, Relevancy and
    materiality, Photograph.  Identification.  Deoxyribonucleic
    Acid.  Practice, Criminal, Capital case, Identification of
    defendant in courtroom, Severance, Mistrial, Argument by
    prosecutor, Sentence.  Constitutional Law, Sentence.



    Indictments found and returned in the Superior Court
Department on September 25, 2007.

    Pretrial motions to suppress evidence were heard by
Cornelius J. Moriarty, J.; and the cases were tried before Peter
A. Velis, J.


    Alan Jay Black for Maxwell Wiggins, Jr.
    Jeffrey L. Baler for Swinkels Laporte.
    Katherine E. McMahon, Assistant District Attorney, for the

---

[1] Thirteen against Maxwell Wiggins, Jr., and fifteen against
Swinkels Laporte.

[2] Justice Hines participated in the deliberation on this
case prior to her retirement.

Commonwealth.

BUDD, J.  On the evening of August 29, 2007, two armed and masked men entered a home in Springfield, assaulting and robbing its occupants at gunpoint.  As they left, the homeowner, Tracy Bennett, who was returning home, was shot and killed.  Swinkels Laporte and Maxwell Wiggins were identified as the assailants and, following a joint jury trial in the Superior Court, were found guilty of murder in the first degree, as well as other offenses related to the home invasion.

On appeal, they primarily claim that witnesses were improperly allowed to identify them as the perpetrators during the trial.  They also raise various evidentiary issues, and claim error in the prosecutor's closing argument.  Wiggins further challenges the denial of his motions to sever and for a mistrial, based on co-counsel's cross-examination of a witness regarding a previously suppressed out-of-court identification.  Laporte separately challenges his nonmurder sentences.  Finally, both defendants seek relief pursuant to G. L. c. 278, § 33E.

We discern no reversible error and, after a thorough review of the record, decline to reduce or set aside the verdicts under G. L. c. 278, § 33E.  Accordingly, we affirm the defendants' convictions.  However, we remand for resentencing Laporte's convictions of home invasion and armed robbery while masked.

Background. We summarize the facts the jury could have found, reserving certain details for discussion of the issues.

Tracy Bennett lived with her adult daughter, Susan; her eighteen year old son, Daniel; Susan's three young children; and a seventeen year old family friend, Angel Colon.[3] The defendants were friends of Daniel and visited him frequently at the Bennett home, where they would often see Susan, Tracy, and Colon as well. The defendants and Daniel usually spent their time in Daniel's room, where they played video games on Daniel's new Xbox video game console. In his room, Daniel kept a safe containing money and marijuana that he sold to friends; the defendants were aware of the safe and had seen its contents. A couple of weeks before the killing, Colon thought he overheard the defendants discussing wanting to take the Xbox.

On the evening of August 29, 2007, Tracy had gone out; Colon and Susan were watching television in Susan's room, and Daniel was with his girl friend in his room. At approximately 10 P.M., two masked African-American men carrying guns entered the home. One was short and skinny; the other was tall and stocky.[4] They wore dark hooded sweatshirts, dark pants, and dark

---

[3] Because Tracy, Susan, and Daniel share a last name, we refer to them using their first names.

[4] According to the record, at the relevant time, Laporte was five feet, eight inches, and weighed approximately 130 pounds.

baseball caps.  One of the sweatshirts had a zipper, and the other was a pullover, like sweatshirts Colon had seen Wiggins and Laporte wear on multiple occasions.  The intruders also wore black bandanas over their noses and mouths.  Colon, who looked down the hallway to see whether Tracy had come home, saw the two proceed toward him and thought that Daniel's friends, Wiggins and Laporte, were playing a joke.  He quickly learned the intruders' intentions when the shorter one said, "Where's the fucking shit?  We ain't playing.  This ain't no joke," and punched him in the face.  Colon and Susan were forced to lie face down on the bed as the shorter assailant took items from the room, including Susan's cellular telephone, a piggy bank, and a small camcorder.

Simultaneously, the taller intruder banged on Daniel's locked bedroom door and then forced the door open.  He pointed a gun at Daniel's face and said, "Give me your shit.  I know you've got it."  The two struggled briefly, then the intruder hit Daniel in the head with the gun, and Daniel opened the safe. The intruder instructed Daniel to put cash, marijuana, the Xbox console, games, and digital video disc (DVD) movies into a large trash bag.

As soon as Colon heard the two men leave the house, he

Wiggins was six feet, one inch tall, and weighed about 200 pounds.

telephoned 911.  As he was on the telephone with the dispatcher, he, Daniel, and Susan heard a gunshot.  They ran outside and found Tracy shot in the face and bleeding profusely.

First responders arrived at the scene shortly after 10 P.M. to attend to Tracy and investigate the crime.  Colon reported to an officer that "Swinkels and Max" committed the crimes and told him where each lived.  At approximately 10:45 P.M., officers arrived at Laporte's home, where they found the defendants.  A search of that home yielded items that appeared to have been stolen from the Bennett home, including an Xbox console and components, games, DVD movies, cash and coins, jewelry boxes, and a digital scale.  The officers also collected other items, including ammunition, three black hooded sweatshirts, and other clothing.

The State police crime laboratory performed forensic testing on the sweatshirts.  The cuffs of one sweatshirt tested positive for gunshot residue (GSR) as well as occult blood.  A second sweatshirt also tested positive for occult blood.  Investigators also performed deoxyribonucleic acid (DNA) testing on swabs taken from the wear areas of the sweatshirts.  DNA testing of samples from the sweatshirt with GSR did not produce any conclusive matches.  However, the investigators found that the second sweatshirt contained a DNA profile matching that of Laporte and a third sweatshirt contained a DNA profile matching

Wiggins.

At trial, the defendants sought to convince the jury that any identification of the defendants as the intruders was a mistake. They argued that Daniel had only mentioned their names to the police when he was asked whether he had any African-American friends and that the police had inappropriately focused on them. Laporte in particular argued that, although the stolen property had been found at his home and his DNA profile matched a sample from one of the black sweatshirts also found there, the robbery could have been committed by his brother, which would also explain those facts. We discuss the defendants' arguments in more detail below.

Discussion. 1. In-court identification of the defendants. Although the defendants' theory was misidentification, this is not a case where the alleged perpetrators were unknown to the eyewitnesses. Daniel, Susan, and Colon had known the defendants for some time. The jury heard testimony that Wiggins and Daniel had been friends for a couple of years prior to the robbery and shooting, and Wiggins frequently visited Daniel. Daniel had known Laporte for approximately six months, during which time Laporte visited Daniel with Wiggins on multiple occasions. Both Susan and Colon saw the defendants when they visited Daniel. Colon, who had already known Laporte for several years, would sometimes play video games with Wiggins, Laporte, and Daniel in

Daniel's room. However, despite the witnesses' familiarity with the defendants, compare, e.g., Commonwealth v. Johnson, 420 Mass. 458, 459-460 (1995) (armed robbers were unknown to defendant), the defense argued that because the intruders wore masks, the witnesses mistook them for the defendants.

On the night of the break-in and shooting, each of the witnesses viewed each defendant separately in what was later determined to be an unnecessarily suggestive showup procedure.[5] As a result, the motion judge suppressed the out-of-court identifications that Colon and Susan had made during the showup and that Daniel had made afterwards at the police station. Nevertheless, the judge allowed all three to make in-court identifications of the defendants at trial: Colon identified both defendants as the intruders; Susan identified Laporte as one of the two intruders; and Daniel identified Wiggins as one of the intruders, although the identification was equivocal. The defendants assert that this was prejudicial error. We

---

[5] The police took each of the witnesses in turn (Daniel, Colon, Susan, and Daniel's girl friend) to Laporte's residence. The defendants were handcuffed and shown to each witness from twelve feet away. After the witness was instructed to look at the subject's height, weight, and build, a police officer asked each witness what he or she had heard the intruder say, and then instructed the respective defendant to repeat it to each witness. The motion judge determined that there was good reason for the one-on-one visual confrontations. However, he found that the voice identification procedures were both unnecessarily and impermissibly suggestive, pursuant to Commonwealth v. Marini, 375 Mass. 510, 516-517 (1978).

disagree.

Colon testified that despite the masks, he recognized the intruders as Wiggins and Laporte as they walked toward him. He recognized the defendants by voice, clothes, build, and the way they walked. He told police at the scene who the assailants were and where they lived. Colon further pointed out Laporte as the intruder who punched him in the mouth during the home invasion. Although the defendants objected to Colon's in-court identifications, there was an independent source for that identification because Colon unequivocally identified the defendants as the perpetrators prior to the suggestive showup procedure.

In court, Susan identified Laporte as the shorter intruder without objection. She testified that although he wore a mask, she recognized Laporte as he walked down the hall toward her by his walk, voice, size, and build. She testified that she told a police officer at the scene that she believed the person who robbed her was Laporte, but she could not recall who she spoke with (no officer confirmed her statement). Because Susan's testimony that she identified Laporte by name before the suggestive procedure would be admissible regardless of the admissibility of her in-court identification, we conclude that there is no substantial likelihood of a miscarriage of justice arising from defense counsel's failure to object to her in-court

identification.

As for Daniel, on direct examination by the Commonwealth, and without objection, Daniel identified Wiggins as the intruder who came into his room.[6] He testified further (without objection) that despite the hood and bandanna, he recognized Wiggins from Wiggins's build, skin tone, and voice, but he later stated that he could not be sure.[7] Although Daniel did not directly identify either of the defendants prior to the tainted showup, he effectively made at least an equivocal identification of Wiggins by his actions at the scene of the crime: Daniel testified that after the shooting he took his mother's keys, got into her vehicle, and planned to go to Wiggins's home to see whether Wiggins had been the intruder in his room. When Colon took the keys away, Daniel telephoned Wiggins's home and Wiggins's sister in an attempt to locate him. This evidence would allow a reasonable jury to conclude that, at a minimum, Daniel had made an equivocal identification of Wiggins as a

---

[6] Daniel also identified both defendants as his friends, and stated their names for the record.

[7] It is worth noting that during his examination, Daniel wavered back and forth several times on his identification of Wiggins. He testified that he told police initially that he did not think the intruder was Wiggins because it was "kind of hard to think that my best friend would rob me and . . . shoot my mom." And despite having identified Wiggins at trial as the assailant, he later testified during direct examination that he still could not be sure that Wiggins was the person who came into his room.

perpetrator prior to the suggestive procedure.  As a result, we conclude that there is no substantial likelihood of a miscarriage of justice arising from the failure by Wiggins's attorney to object to an in-court identification that, viewed in its totality, also was equivocal.

2.  Daniel's out-of-court identification.  Wiggins asserts that there was error in admitting testimony of a police officer about Daniel's out-of-court identification of Wiggins because it had previously been suppressed.  Wiggins also argues that the trial judge erred in denying his motions to sever and for a mistrial based on co-counsel's cross-examination of Daniel that led to the police officer's testimony.  We conclude that there was no abuse of discretion in denying Wiggins' motions. Further, we conclude that there was no substantial likelihood of a miscarriage of justice in admitting evidence of Daniel's out-of-court identification.

The out-of-court identification, made during police questioning following a showup procedure on the night of the murder, was suppressed because the showup was found to be unnecessarily suggestive.  See note 5, supra.  During cross-examination by Laporte's counsel, Daniel was questioned about his ability to see the perpetrator given the lighting and the mask, as well as his failure to identify Wiggins to the police as one of the perpetrators until much later in the night, when

police informed him that his mother had died.  This included multiple questions pertaining to the previously suppressed out-of-court identification by Daniel of Wiggins.[8]  Wiggins did not

_____

[8] At trial, the following exchange occurred during cross-examination of Daniel by Laporte's counsel:

Q.:  "[Y]ou knew the items [shown to you] were stolen; correct?"

A.:  "Yes."

Q.:  "So when you saw they had been recovered, your testimony is somehow the fact that the items were recovered made you more certain at the time that Maxwell Wiggins robbed you?"

A.:  "Yes."

. . .

Q.:  "Isn't it true, sir, that you never told the cops that you were sure or pretty sure that Maxwell Wiggins robbed you until after they told you your mom is dead, this is no game, we need to know who the robbers are, or robber is; is that correct?"

A.:  "I had an idea before that, yes."

. . .

Q.:  "And when the police told you that your mother was dead, they just told you right there in the interview room at the police department; isn't that right?"

A.:  "Yes."

Q.:  "You obviously reacted with great emotion; isn't that true?"

A.:  "Yes."

Q.:  "You were sobbing; right?"

object to this questioning at the time. Wiggins also did not object when the prosecutor, in turn, asked Daniel about his out-of-court identification of Wiggins during redirect examination. However, both defendants later objected to the prosecutor's questioning of the detective who had taken Daniel's statement, which included Daniel's identification of Wiggins. The defendants also moved for a mistrial. The judge denied the motion but ordered the prosecutor not to inquire "in the slightest fashion, regarding anything that [the motion judge] suppressed."

The next morning, the prosecutor asked the judge to allow her to question the detective about the identification of Wiggins, arguing that Laporte had "open[ed] the door" and Wiggins had failed to object. In response, Wiggins moved to sever and for a mistrial. The judge denied both motions. In addition, after reviewing the transcripts, the judge ruled that Wiggins had waived his right to enforce the suppression ruling, at least as to whether Daniel had identified Wiggins at the police station. The judge allowed the prosecutor to elicit the same testimony as Laporte's counsel, i.e., that after Daniel

---

A.: "Yes."

Q.: "And then you gave the name Maxwell Wiggins as being the robber from your room; is that right?"

A.: "Yes."

heard that his mother had died, he identified Wiggins as the robber.[9]

---

[9] The prosecutor asked the detective the following:

Q.:  "And did he tell you how he knew Maxwell Wiggins?"

A.:  "Yes."

Q.:  "And did he describe Maxwell Wiggins for you?"

A.:  "Yes."

Q.:  "And did he tell you he had seen Maxwell Wiggins earlier the night this happened?"

A.:  "That's correct."

. . .

Q.:  "And then at some point you told him that his mother had passed away, is that right?"

A.:  "That's correct."

Q.:  "What was his demeanor then?"

A.:  "At that point he even became more upset and a lot of crying."

Q.:  "And after he was allowed to compose himself, you spoke to him further?"

A.:  "That's correct."

Q.:  "And was it then that you began a typed statement from him?"

A.:  "That's correct."

. . .

Laporte waived any objection to the admission of Daniel's out-of-court identification based on his counsel's cross-examination of Daniel on this topic; thus, had the defendants been tried separately, Laporte would have "opened the door," allowing the Commonwealth to respond. See Commonwealth v. Alcantara, 471 Mass. 550, 557 n.6 (2015), citing Commonwealth v. Williams, 379 Mass. 600, 604-605 (1980) (where defendant waives issue by using challenged statements, he "open[s] the door to their use by the Commonwealth"). Accord Pettijohn v. Hall, 599 F.2d 476, 481 (1st Cir.), cert. denied, 444 U.S. 946 (1979) ("Once a defendant attempts to introduce testimony that is intimately interrelated with previously suppressed testimony, the defendant waives his objections to the introduction of that related evidence"). Wiggins contends, however, that Laporte's counsel's actions could not waive Wiggins's rights, for due process reasons. We agree. Cf. Commonwealth v. Collado, 426 Mass. 675, 676 (1998) (defendant's waiver of right to jury trial did not affect codefendant's right). Accord United States v. White, 887 F.2d 267, 269-270 (D.C. Cir. 1989).

However, although Laporte could not waive Wiggins's rights,

Q.: "And in the course of taking that statement, after he was told that his mother died, is that when he said Maxwell Wiggins was the robber in his room?"

A.: "That's correct."

Wiggins failed to object to his codefendant's cross-examination of Daniel, to the prosecutor's redirect examination, or to Daniel's in-court identification of Wiggins.  As a result, where admission of any of the related identifications would have been error, we consider how those errors could have combined to cause a substantial likelihood of a miscarriage of justice in the context of the evidence adduced at trial.[10]  See Commonwealth v. DePina, 476 Mass. 614, 623 (2017).  Based on Daniel's in-court identification of Wiggins as one of the perpetrators, Daniel's actions to check Wiggins's whereabouts following the killing, and the fact that Colon named Wiggins to police officers at the scene of the crime, the jury had a reasonable basis to conclude that Wiggins had participated in the robbery.  In this context, Laporte's line of questioning did not cause a substantial likelihood of a miscarriage of justice.  We reach the same conclusion as to the Commonwealth's examination of the police detective on this issue, as the prosecutor was not permitted to

_____

[10] Although Wiggins did not make a claim of ineffective assistance of counsel on appeal, see Commonwealth v. Francis, 411 Mass. 579, 584 (1992) ("pursuant to [G. L. c. 278,] § 33E, we afford such appeals plenary review"), to the extent that counsel's failure to object to Laporte's and the Commonwealth's lines of questioning could support such a claim, this would not change our analysis.  See Commonwealth v. Holley, 476 Mass. 114, 121 (2016), citing Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014) ("under § 33E review, an ineffective assistance of counsel claim is reviewed under substantial likelihood of miscarriage of justice standard").

inquire beyond the testimony that had already been elicited by Laporte.[11]  Compare note 8 with note 9, supra.

Further, in the circumstances, we conclude that the trial judge did not abuse his discretion in denying Wiggins's renewed motion for a mistrial and his motion to sever.  See Commonwealth v. Gallagher, 408 Mass. 510, 517 (1990) (mistrial is subject to judge's discretion); Commonwealth v. Jackson, 391 Mass. 749, 759 (1984), quoting Commonwealth v. DiPietro, 373 Mass. 369, 387 (1977) (ground for mistrial "must be called to the attention of the judge immediately, or when the aggrieved party first learns of it"); Commonwealth v. Moran, 387 Mass. 644, 658 (1982) (abuse of discretion upon timely motion to sever).  Wiggins failed to object in a timely manner to both the examinations by the codefendant and the Commonwealth.

The failure to make a timely objection to Laporte's examination of Daniel is particularly noteworthy given that there was a break shortly after the testimony in question; thus, any concern about drawing attention to the testimony in front of

---

[11] Laporte elicited the details of this identification to show the jury that Daniel had only identified Wiggins as one of the intruders because he was distressed about his mother's death.  In fact, Wiggins later elicited testimony to emphasize that Daniel had not identified him prior to learning about the death.  Further, Daniel testified that he was still not sure whether Wiggins was one of the intruders.  This, combined with the limitation on the prosecutor's inquiry, meant that there is no substantial likelihood of a miscarriage of justice from allowing the prosecutor to elicit the identification.

the jury could have been mitigated by raising the issue and moving to sever while the jury were not present.  In addition, Wiggins's counsel indicated that he had discussed his concerns regarding the examination with Laporte's counsel during the break, yet he did not raise the issue with the court until four days later, when the Commonwealth pointed out Wiggins's failure to object.  Because Wiggins did not make these motions in a timely manner, the judge reasonably could have inferred that Wiggins had made a conscious decision not to object.  Therefore, there was no abuse of discretion in denying Wiggins's motions.

3.  DNA evidence.  Laporte argues separately that the judge incorrectly admitted inconclusive DNA evidence in the form of a chart showing DNA test results from one of the sweatshirts.  The judge had excluded testimony that DNA testing of the sweatshirt was inconclusive as to Laporte.[12]  However, the jury were exposed to a chart showing that Wiggins and the victim were excluded as sources of the sample from one sweatshirt, but also showed that the results were inconclusive as to Laporte.  After the chart

_____

[12] Deoxyribonucleic acid (DNA) test results are inconclusive if they neither include nor exclude a person as a match due to an insufficient or degraded sample.  Commonwealth v. Almonte, 465 Mass. 224, 238 (2013).  With limited exceptions, such evidence is normally too prejudicial to be admissible.  See Commonwealth v. Nesbitt, 452 Mass. 236, 253-254 (2008).

was introduced alongside testimony from a State analyst,[13] but before the chart was given to the jury during deliberations, the judge redacted Laporte's DNA profile from the chart.  Laporte's profile was not redacted from other exhibits, which showed that Laporte was excluded from a second sweatshirt sample and matched the major DNA profile on a third sweatshirt sample.  He argues that because the jury had seen his DNA profile on the chart in question before it was redacted, and because the jury had his profile available to them from other exhibits, they may have tried to compare his profile to the inconclusive results.  This argument fails.

The Commonwealth was entitled to have the analyst testify as to those results that showed an exclusion or a match, and the exhibit in question showed the full comparison that was made at the State crime laboratory.  Moreover, the analyst did not testify as to Laporte's result compared to the sweatshirt, and the judge redacted Laporte's profile before the exhibit went to the jury.  Because the jury were entitled to see Laporte's profile with respect to the other DNA comparisons, there was no error in declining to redact his profile from the other

---

[13] The analyst testified that the decedent was included in a sample from one area of the sweatshirt, and that the decedent and Wiggins were excluded from a sample of another area from the sweatshirt.  She did not testify as to any results for Laporte from that sample.

exhibits.[14]

4. <u>Bandannas</u>. The defendants argue that the judge erred in allowing the Commonwealth, over objection, to elicit testimony that someone who was not a member of law enforcement removed two bandannas from Laporte's property bag while Laporte was in custody. The bandannas had been collected along with the rest of Laporte's personal items during booking. More than one year later, someone removed the bandannas when trading new clothes on behalf of Laporte.[15] The Commonwealth offered the testimony to show why the bandannas were not available as evidence. The defendants argue that, because they did not challenge the police investigation as inadequate (also known as a <u>Bowden</u> challenge, see <u>Commonwealth</u> v. <u>Bowden</u>, 379 Mass. 472 [1980]), the evidence was irrelevant and highly prejudicial. We disagree.

Evidence is only admissible if it is relevant, that is, "if (a) it has any tendency to make a fact more or less probable

---

[14] Even if there had been error, it would have been harmless viewed in the context of the trial as a whole. The State analyst did not testify as to the inconclusive result. However, there was a match between Laporte's DNA and another sweatshirt that was found in the same location and showed a positive result in the presumptive test for blood. Colon testified that Laporte had worn that sweatshirt during the robbery and on other occasions.

[15] A correction officer testified that the sheriff's department required that any new items brought to inmates must be traded for old items from the inmate's property bag.

than it would be without the evidence and (b) the fact is of consequence in determining the action." Mass. G. Evid. § 401 (2017). See id. at § 402. See Commonwealth v. Carey, 463 Mass. 378, 387 (2012). The defendants argue that the evidence regarding the removal of the bandannas was not relevant to the case. In their view, the jury only needed to hear that the bandannas were found on Laporte when he was arrested. They also argue that there was no evidence that these bandannas were the ones involved in the incident. However, the very fact that the defendants contested the lack of evidence surrounding the bandannas is what made their removal relevant to rebut the defendants' attempted Bowden defense.[16] At trial, the defendants argued at sidebar that the perpetrators had been observed wearing bandannas, but not necessarily the bandannas that had been taken from Laporte's property bag. The bandannas had been removed, so the Commonwealth could not introduce them in evidence, nor could it test the bandannas for gunshot residue, blood, or DNA in an attempt to show that they were the bandannas

---

[16] See Commonwealth v. Silva-Santiago, 453 Mass. 782, 803 n.25 (2009); Commonwealth v. Bowden, 379 Mass. 472, 486 (1980). Even though the judge ultimately determined that the defendants had not made a showing sufficient to warrant a Bowden instruction, we are unpersuaded by the defendants' argument that there was no attempt to make a Bowden challenge; the defendants clearly claimed throughout trial that there were problems with the police investigation, and the principal theory of the defense was misidentification, yet the bandannas had not been tested.

used during the home invasion.[17]  Because it appeared that the defendants attempted to raise a <u>Bowden</u> defense, and because they attacked the integrity and adequacy of the investigation throughout the trial, the Commonwealth was entitled to respond. See <u>Commonwealth</u> v. <u>Avila</u>, 454 Mass. 744, 754-755 (2009); <u>Commonwealth</u> v. <u>Silva-Santiago</u>, 453 Mass. 782, 803 n.25 (2009).

The defendants further argue that even if the removal of the bandannas from Laporte's property bag were relevant to the case, the judge erred in admitting that evidence because its probative value was substantially outweighed by the danger of unfair prejudice.  See Mass. G. Evid. § 403 (2017).  See <u>Carey</u>, 463 Mass. at 387-388.  In particular, they argue that the jury may have interpreted the removal of the bandannas as showing consciousness of guilt.  Indeed, the judge recognized that telling the jury that it was a member of Laporte's family who exchanged clothing for the bandannas could be unduly prejudicial to the defendants.  As a result, following a lengthy sidebar discussion, the judge limited the prosecutor to eliciting

---

[17] To the extent that the defendants argue that the evidence of removal was irrelevant because the Commonwealth knew about the bandannas immediately after the arrest but did not seize or test them, their argument is misplaced, as the bandannas were not lost or destroyed as a result of the Commonwealth's negligence.  Contrast <u>Commonwealth</u> v. <u>Olszewski</u>, 401 Mass. 749, 756 (1988) ("loss and destruction of highly relevant evidence by the Commonwealth and its agents defeated the defendant's opportunity effectively to present a defense").

testimony that someone who was not a member of law enforcement picked up the bandannas, so long as the witness also explained to the jury that the policy required an exchange of clothes. The judge reasoned that omitting the family member's name and including the inventory policy would "soften[] any prejudicial impact."  The judge also gave an instruction immediately after that testimony to warn the jury not to draw any negative inference against the defendants.  See Commonwealth v. Tennison, 440 Mass. 553, 558 (2003), citing Commonwealth v. Degro, 432 Mass. 319, 328 (2000) ("jury are presumed to follow the judge's instructions").  In this context, where the judge carefully considered the options to reduce any possible prejudice to the defendants, there was no abuse of discretion.  See Commonwealth v. Bresilla, 470 Mass. 422, 436-437 (2015).

5. Autopsy photograph.  The defendants claim that the judge erred in admitting an autopsy photograph of the victim. The photograph showed how the victim's face looked after the medical examiner had removed the sutures and other fixes used by the emergency medical technicians who sought to stem the bleeding and save the victim's life.  With the sutures removed, the photograph showed a portion of the inside of the victim's mouth and sinus cavity.  In the defendants' view, the photograph was cumulative of other evidence and was so gruesome and inflammatory that its probative value was outweighed by the

potential for prejudice.  There was no error.

We have warned judges to be especially careful regarding photographs taken after a medical examiner has modified the victim's body in the course of an autopsy.  See Commonwealth v. Carlino, 429 Mass. 692, 696 n.2 (1999), citing Commonwealth v. Bastarache, 382 Mass. 86, 106 (1980).  In Carlino, supra, for example, photographs of damaged internal organs were unnecessary where the Commonwealth had introduced other "photographs of the exterior of the body, . . . a chalk depicting the location of the wounds, and extensive expert medical testimony as to the nature, extent, and severity of the wounds."  However, "we do not exclude evidence just because it is gruesome or inflammatory."  Id.  Therefore, the judge may admit a photograph if it is relevant, not gratuitous, and probative beyond its "distasteful nature."  Id.  See Bastarache, supra.

In this case, although the photograph did not show alterations of the nature made in Carlino and Bastarache, the judge recognized that it still held a potential for prejudice.  Compare Carlino, 429 Mass. at 696 (photograph showed victim's internal organs and abdominal cavity); Bastarache, 382 Mass. at 105-106 (photograph showed inside of skull after brain had been removed to show bullet holes).  In fact, the judge initially declined to allow the Commonwealth to introduce the photograph through the State medical examiner.  However, he eventually

changed that ruling because one of the Commonwealth's witnesses, a State expert in ballistics, explained that the photograph was an important tool for determining the type of firearm and force used, as well as the distance from the weapon to the victim's face.  During a lengthy discussion with the prosecutor and both defendants' counsel, the judge reasoned that these facts were probative of premeditation and whether the killing had been committed with extreme atrocity or cruelty.  He also noted that the ballistics expert had stated that the autopsy diagrams alone had been insufficient for him to make the determinations.  As a result, the judge admitted the autopsy photograph in evidence and gave a contemporaneous cautionary instruction to the jury.

In light of the judge's careful analysis of the relevance and probative value of the photograph before admitting it in evidence, and the curative instruction, there was no abuse of discretion.

6.  <u>Closing argument</u>.  The defendants argue that the prosecutor misstated key identification evidence in her closing argument.  In particular, they contend that the Commonwealth improperly argued that the jury "kn[e]w with absolute certainty" that Colon identified the defendants as the intruders because, she argued, the police sought out the defendants based on Colon's identification of them in the immediate aftermath of the

shooting.[18]  In their view, this was a misstatement of the evidence because, they claim, Daniel's statement to the police, rather than Colon's, could have led the police to the defendants.  Because the defendants did not object to this portion of the argument at trial, they must show that the alleged misstatement or counsel's failure to object caused a substantial likelihood of a miscarriage of justice. Commonwealth v. Carmona, 428 Mass. 268, 273, 276 (1998).  This they cannot do.

Daniel testified that when he spoke to the police at the crime scene he identified only Wiggins, and he did so in response to the police asking if he had any African-American friends; thus, he identified Wiggins as a friend, not a suspect.[19]  In contrast, Colon and a police officer both

---

[18] The prosecutor said:

> "[A]s you look to decide this case, start with the things that you know for certain, the things that are given. . . .  And you know with absolute certainty that Angel Colon identified those two men, the defendants, as the intruders to police at the scene.  Angel Colon told you.  Officer Ed Kalish told you.  And, ladies and gentlemen, you know that that happened.  You know Angel Colon identified them because the police went looking for the two of them."

[19] However, officers present at the scene testified that Daniel named both defendants.  Whether the jury believed Daniel gave one or both names to the police ultimately does not matter, as the police still would have been searching for both defendants.

testified that when Colon spoke to police at the crime scene, he named the defendants as the intruders and told police the streets where the defendants lived. According to police testimony, after speaking with Daniel and Colon they sought both of the defendants.

"A prosecutor may argue 'forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence.'" Commonwealth v. Taylor, 455 Mass. 372, 383 (2009), quoting Commonwealth v. Kozec, 399 Mass. 514, 516 (1987). Here, the police were looking for both Laporte and Wiggins, not just Wiggins. In addition, it was Colon who gave the police the names of the streets where the defendants lived. Thus, it was fair for the prosecutor to argue that the jury could infer that the police based their search for the defendants on Colon's statement (rather than Daniel's). See Commonwealth v. Rolon, 438 Mass. 808, 816 (2003) (prosecutor may "point to reasons why a witness's testimony, or portions of a witness's testimony, should logically be believed"). Further, the judge instructed the jury that counsel's arguments are not evidence. In any event, even if the defendants were correct, their argument nonetheless indicates (as does the Commonwealth's) that someone had identified them at the scene, so they have failed to establish how any error would have influenced the jury's verdicts.

7.  _Laporte's sentence_.  Because Laporte was a juvenile at the time of the offense, his sentence was revised, and he is eligible for parole on his conviction of murder after fifteen years.  See Miller v. Alabama, 567 U.S. 460, 465 (2012); Commonwealth v. Brown, 466 Mass. 676, 688-689 (2013), S.C., 474 Mass. 576 (2016); Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 658-659 (2013), S.C., 471 Mass. 12 (2015).  Laporte was also convicted of other crimes, including home invasion and robbery while masked, for which he was sentenced to from thirty to thirty-five years and from twenty to thirty years in State prison, respectively, and is eligible for parole after thirty years and twenty years, respectively.[20] Laporte argues that the Eighth and Fourteenth Amendments to the United States Constitution and art. 26 of the Massachusetts Declaration of Rights require reduction of the minimum terms on the latter sentences to no more than fifteen years, to allow for the same parole eligibility as does his conviction of murder.

---

[20] Laporte's sentence for home invasion was initially to be served from and after the life sentence, with sentences for the other nonmurder convictions to be served concurrently with the sentence imposed for home invasion.  These sentences were all changed to be made concurrent with the murder sentence by the Appellate Division of the Superior Court.  Following our holding in Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655, 658-659 (2013), S.C., 471 Mass. 12 (2015), the Department of Correction noted that Laporte would be eligible for parole after fifteen years on his life sentence.  Parole eligibility for the other convictions remains unchanged.

As in Commonwealth v. Costa, 472 Mass. 139, 143-146 (2015), the original sentencing judge could not have foreseen our decisions in Diatchenko and Brown.  At the time the defendant was sentenced on his nonmurder convictions, the sentencing judge likely believed that the defendant would never be eligible for parole on his murder conviction.  See Costa, supra.  Thus, the judge may not have given the same consideration to how the defendant's nonmurder convictions would affect his eligibility for parole.  Id.  See Commonwealth v. Perez, 477 Mass. 677, 682-687 (2017).  As a result, we vacate Laporte's nonmurder sentences and remand for resentencing in light of his revised murder sentence.  See Costa, supra at 143.

8.  G. L. c. 278, § 33E.  Even though Wiggins was an adult at the time of the crime, he argues that it is unfair for Laporte to receive the benefit of parole eligibility while Wiggins does not, as Wiggins is only months older than Laporte. In his view, we should exercise our power under G. L. c. 278, § 33E, to reduce his conviction so their sentences will match. Although we recognize his point, particularly as contrasted against Laporte's juvenile status at the time of the homicide, the fact that Wiggins was only a few months past his eighteenth birthday does not, in itself, give us reason to reduce his conviction.  See Commonwealth v. Chukwuezi, 475 Mass. 597, 610 (2016), citing Roper v. Simmons, 543 U.S. 551, 574 (2005) (age

of eighteen "is the point where society draws the line for many purposes between childhood and adulthood"); Brown, 466 Mass. at 684-685 (Legislature's "comprehensive sentencing scheme . . . remains valid as applied to adults").  Thus, we decline to exercise our § 33E power based on the comparative ages of the defendants.

We have considered the defendants' other arguments and find them without merit.  Therefore, we decline to exercise our power under § 33E to reduce the defendants' verdicts or grant them a new trial.

Conclusion.  For the reasons stated above, we affirm the defendants' convictions.  However, we remand Laporte's convictions of home invasion and armed robbery while masked for resentencing in accordance with Perez, supra.

So ordered.